UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| AMANDA RAKES, *Administrator of the Estate of Amylyn Slaymaker and Next Friend to the Minor Children G.C. and M.C.*, | ) ) ) ) |
| *Plaintiff*, | ) No. 4:21-cv-00114-JMS-DML ) |
| vs. | ) ) ) |
| JONATHAN PAUL ROEDERER and THE ESTATE OF TE'JUAN JOHNSON, | ) ) ) |
| *Defendants*. | ) |

**ORDER**

Amylyn Slaymaker was tragically killed by her husband, RJ Slaymaker, the day after a violent encounter with RJ. The Administrator of Amylyn's Estate, Amanda Rakes, initiated this litigation as next friend to Amylyn's two minor children, focusing on the actions of two of the police officers who responded to the scene of the encounter – Defendants Jonathan Roederer and Te'Juan Johnson. Officer Roederer and the Estate of Officer Johnson[1] have filed a Motion for Judgment on the Pleadings, [Filing No. 46], which is now ripe for the Court's review.

**I.**
**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Pleadings include "the complaint, the answer, and any written instruments attached as exhibits." *Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 312 (7th Cir. 2020) (quotation and citation

---

[1] Officer Johnson passed away after the events which are the subject of this litigation. Although his Estate is the Defendant in this matter, the Court refers to Officers Johnson and Roederer collectively as "Defendants" in this Order.

omitted). "The only difference between a motion for judgment on the pleadings and a motion to dismiss [under Rule 12(b)(6)] is timing; the standard is the same." *Id.* When evaluating a motion to dismiss, the Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016) (citation omitted).

Under Federal Rule of Civil Procedure 12(b)(6), the allegations in a complaint must "'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Id.* at 480 (quoting *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). A complaint that offers "'labels and conclusions'" or "'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court must identify allegations "that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft*, 556 U.S. at 679. Ultimately, dismissal is only appropriate "if it appears beyond doubt that the plaintiff could prove no set of facts in support of [her] claim that would entitle [her] to the relief requested." *Enger v. Chicago Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016) (quotation and citation omitted).

The Court notes that Ms. Rakes submitted several exhibits with her response to the Motion for Judgment on the Pleadings, including two flash drives with dashcam or bodycam video from Defendants, Charlestown Police Department Standard Operating Procedures, a Case Report completed by Officer Johnson, medical records for RJ from Clark Memorial Hospital, and an investigative report completed by Detective James Haehl. [Filing No. 48-1; Filing No. 48-2; Filing No. 48-3; Filing No. 48-4; Filing No. 48-5; Filing No. 48-6.] "If, on a motion under Rule…12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be

treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. Rule Civ. P. 12(d). Defendants specifically request that their motion not be converted into one for summary judgment, [Filing No. 47 at 6], and Ms. Rakes does not request that the motion be converted to one for summary judgment based on her submission of the exhibits, [*see* Filing No. 48]. The Court declines to convert Defendants' Motion for Judgment on the Pleadings into a Motion for Summary Judgment and, consequently, does not consider the exhibits that Ms. Rakes submitted with her response brief.

## II.
## BACKGROUND

The following factual allegations are taken from the Complaint, [Filing No. 1], and are accepted as true solely for the purpose of this Order.

### A. The July 18, 2019 Incident

On July 18, 2019 at approximately 11:30 p.m., Defendants, who were both officers with the Charlestown Police Department, were dispatched to a domestic disturbance after a 911 caller advised that a man was hitting a woman and that it appeared the man had a gun. [Filing No. 1 at 2.] When Defendants arrived, Amylyn immediately told Officer Johnson, "I'm scared for my life. Is the gun off him? He has PTSD and he's drunk and he's threatening to kill me, my family. And my kids live right over there." [Filing No. 1 at 2.] Amylyn told Defendants that RJ had struck her with a gun and then punched her in the face, although she had blocked the punch with her arm. [Filing No. 1 at 2.] RJ told Officer Roederer that the couple had argued because RJ was drinking and driving, but he denied threatening or hitting Amylyn. [Filing No. 1 at 3.]

Defendants asked Amylyn why she had a gun in her purse, and she responded, "Because he'd threatened to kill my kids' dad and my kids." [Filing No. 1 at 3.] Amylyn told Defendants

3

that RJ pretended to shoot himself in a video call with her earlier that evening, and later texted her that he was going to her ex's house, where her children were staying, to kill her ex. [Filing No. 1 at 3.] Amylyn advised Defendants that she had come to try to stop RJ and that when she confronted him in front of her ex's house, he had said, "do you want me to shoot you and then the kids come out in the morning to see their mother dead?" [Filing No. 1 at 3.] Amylyn showed Defendants the threatening text messages from RJ and told them that in the past, RJ had told her that if she called the police, he would "commit suicide by cop." [Filing No. 1 at 3.]

Officer Roederer interviewed the individuals who had called 911 regarding the encounter between Amylyn and RJ, and they told Officer Roederer that they saw RJ hit Amylyn through her car window with "what looked to be a gun." [Filing No. 1 at 3.] After interviewing the 911 callers, Officer Roederer told Officer Johnson that the witnesses "saw [RJ's] arms going up, but didn't see him hit her," and that they did not "know for sure if they saw a gun." [Filing No. 1 at 3.] Defendants decided there was no evidence that RJ has struck or threatened Amylyn and determined that they would not make an arrest. [Filing No. 1 at 3.] Defendants also determined that they would not let RJ drive home because he was intoxicated, and that they would take custody of his handgun. [Filing No. 1 at 3.]

When Officer Johnson told Amylyn that they would not be arresting RJ but would take temporary custody of his gun due to his intoxication, she asked Officer Johnson if he would also take custody of two AR-15s which were at their house. [Filing No. 1 at 3.] Officer Johnson advised Amylyn that she should spend the night at her parents' house, to which she replied "he's going to hurt me…once he finds me." [Filing No. 1 at 4.] Officer Johnson told Amylyn that she needed to get a protective order, "act as an adult," and file for divorce. [Filing No. 1 at 4.] He told her that if her children had been present that night, "[Child Protective Services] would get involved.

4

Your kids would be taken away." [Filing No. 1 at 4.] Officer Johnson also told Amylyn that a protective order is "a piece of paper…that's not going to keep him away from you," and Officer Roederer advised Amylyn to get a mental inquest warrant. [Filing No. 1 at 4.]

Amylyn told Defendants that RJ was suicidal and showed them a picture of RJ pointing a gun at his head. [Filing No. 1 at 4.] Defendants then told RJ that they wanted him to go to Clark Memorial Hospital to be evaluated. [Filing No. 1 at 4.] They told RJ that they could "write up everything" and force him to go to the hospital, or he could go voluntarily. [Filing No. 1 at 4.] Defendants promised RJ that if he agreed to go to the hospital, they would not share the photograph of him pointing a gun at his head with medical personnel, or disclose any details about that evening. [Filing No. 1 at 4.] Defendants also told RJ that if he went to the hospital voluntarily, he would not be forced to stay there for any specified time and he could have Amylyn pick him up when he was finished. [Filing No. 1 at 4.] When paramedics arrived, Officer Johnson told them, "This is RJ. He got in trouble with his wife. He's having a bad day. Problems. He wants to volunteer to get checked out." [Filing No. 1 at 4.] Officer Johnson did not provide any other information to the paramedics, and RJ left the scene with them. [Filing No. 1 at 4.]

When Defendants returned to Amylyn's vehicle, she asked, "you said it's a 24-hour thing, right? For his evaluation?," to which Officer Johnson replied, "Yes." [Filing No. 1 at 5.] Amylyn told Defendants that RJ regularly forced her to engage in sex acts with strangers, and that he was upset that night because she did not meet the man she was supposed to have sex with. [Filing No. 1 at 5.] She also told Defendants that RJ had shot at her in the past. [Filing No. 1 at 5.] Officer Johnson asked Amylyn if she was going to return to her house, and Amylyn responded, "well, tonight, yeah. You said it's a 24 hour." [Filing No. 1 at 5.] Amylyn said she would collect her

belongings and the AR-15s and then go to her parents' house, and Defendants agreed with that course of action. [Filing No. 1 at 5.]

RJ entered the Clark Memorial Hospital Emergency Department alone at approximately 1:00 a.m. [Filing No. 1 at 5.] He told medical workers that he did not use a handgun during the argument with Amylyn, that he did not threaten anyone, and that he was not homicidal or suicidal. [Filing No. 1 at 5.] RJ's blood alcohol level at the hospital was 0.12. [Filing No. 1 at 5.]

At 1:33 a.m., Amylyn called Officer Johnson and told him that she had found visible injuries on her body as proof that RJ had hit her. [Filing No. 1 at 5.] She then went to the Charlestown Police Department so that Officer Johnson could photograph her injuries. [Filing No. 1 at 5.] While she was there, Amylyn again asked how long RJ would be in the hospital. [Filing No. 1 at 5.] Defendants did not complete police reports that night, and did not input any narrative notes into the dispatch call record. [Filing No. 1 at 5.]

RJ left Clark Memorial Hospital at 3:18 a.m., went to the home he shared with Amylyn, and shot and killed Amylyn with one of his AR-15s. [Filing No. 1 at 5.] That evening, he confessed to his mother that he had killed Amylyn, and committed suicide shortly thereafter. [Filing No. 1 at 6.]

    **B.**    **The Lawsuit**

Ms. Rakes initiated this litigation on July 15, 2021 as the Administrator of Amylyn's Estate and the next friend of her two minor children. [Filing No. 1.] She asserts claims against Defendants: (1) under 42 U.S.C. § 1983 for violation of Amylyn's Fourteenth Amendment rights by "affirmatively plac[ing] Amylyn in a heightened state of special danger that Amylyn would not otherwise have faced when they falsely told Amylyn that RJ would be in the hospital for 24 hours and it was safe to return home," because "[i]t was foreseeable that RJ would return to the home

6

and harm Amylyn during the 24-hour period that Amylyn thought RJ would be hospitalized"; and (2) under 42 U.S.C. § 1985 for conspiring to deprive Amylyn of her constitutional right to equal protection because Amylyn "was a member of a protected class" and Defendants' actions "were motivated by discriminatory animus toward Amylyn's gender." [Filing No. 1 at 6-7.] Defendants have now filed a Motion for Judgment on the Pleadings as to both of Ms. Rakes' claims. [Filing No. 46.]

### III.
### DISCUSSION

In their Motion for Judgment on the Pleadings, Defendants argue that: (1) Ms. Rakes' § 1983 claim fails because she cannot establish that a constitutional violation took place; (2) Ms. Rakes' § 1985 claim fails because there was no underlying constitutional violation to support a conspiracy claim; and (3) Defendants are entitled to qualified immunity on all of Ms. Rakes' claims. [Filing No. 47 at 6-21.] The Court discusses each argument in turn.

### A. Whether Ms. Rakes Has Sufficiently Alleged That a Constitutional Violation Took Place

In support of their motion, Defendants argue that Ms. Rakes does not have a valid § 1983 claim because they did not violate Amylyn's Due Process rights. [Filing No. 47 at 9.] They assert that in order to assert a state-created danger claim – as Ms. Rakes does here – "a plaintiff must plead facts showing some affirmative act on the part of the state that either created a danger to the plaintiff or rendered [her] more vulnerable to an existing danger." [Filing No. 47 (quotation and citation omitted).] Defendants contend that "[t]he Seventh Circuit has steadfastly required affirmative state action that created danger where none previously existed before it will sustain a state-created danger exception," and that "Defendants did nothing to create a danger and nothing to exacerbate the danger Amylyn already faced with RJ." [Filing No. 47 at 9-13.] They rely

heavily on a Fourth Circuit Court of Appeals case that they claim is "closely analogous" – *Pinder v. Johnson*, 54 F.3d 1169 (4th Cir. 1995) – and argue that Ms. Rakes' allegations are more akin to a failure to protect Amylyn, which does not constitute a constitutional violation. [Filing No. 47 at 14.] Defendants argue further that Ms. Rakes cannot establish that the Officers' actions were the proximate cause of Amylyn's death, nor that the Defendants' actions shocked the conscience. [Filing No. 47 at 15-18.]

In her response, Ms. Rakes argues that Defendants' actions of assuring Amylyn that RJ would be held at the hospital for 24 hours and that it was safe for her to go home amounted to Defendants "actively stag[ing] the circumstances that allowed RJ to ambush and kill [her]." [Filing No. 48 at 10.] Ms. Rakes contends that if not for Defendants' assurances, Amylyn would not have gone home that evening and that "[i]t is unlikely that RJ would still be a threat to Amylyn 24 hours after their encounter with [Defendants]." [Filing No. 48 at 11.] Ms. Rakes argues that other courts of appeals have "regularly distinguished" *Pinder*. [Filing No. 48 at 8-9.] As to proximate cause, Ms. Rakes argues that "not only was Amylyn part of a foreseeable class as a domestic violence victim, she was also part of the incredibly limited class of people Defendants knew RJ was actively threatening: Amylyn, her parenting partner, and their children." [Filing No. 48 at 13.] Finally, Ms. Rakes argues that "[t]he combination of the passage of time [between the initial encounter and Defendants assuring Amylyn that it was safe to go home], the repeated knowing lies and violations of policy, and the continued disregard for Amylyn's safety amounts to deliberate indifference" to Amylyn's safety. [Filing No. 48 at 14.]

In their reply, Defendants argue that any failure to follow internal procedures "does not amount to affirmative conduct and sounds in inaction rather than action." [Filing No. 52 at 4-5.] They also reiterate their argument that Defendants "did not create or encourage RJ's violent

8

tendencies," but rather "[t]he danger to Amylyn was created by the already-existing, violent nature of RJ." [Filing No. 52 at 6.] Defendants also argue that state-created danger claims are properly decided at the pleadings stage, and again rely extensively on *Pinder*. They assert that their conduct was not conscience-shocking because they questioned Amylyn, RJ, and the 911 callers; took custody of RJ's firearm; advised Amylyn to spend the night at her parents' house; and instructed her to file for divorce, seek a protective order, and get a mental inquest warrant. [Filing No. 52 at 11.]

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Ms. Rakes alleges that Defendants violated Amylyn's Fourteenth Amendment rights by informing Amylyn that RJ would be held at the hospital for 24 hours and assuring her that it was safe for her to return home, which "placed [her] in a heightened state of special danger that [she] would not otherwise have faced." [Filing No. 1 at 6.] The Due Process Clause generally has not been interpreted to require state actors to protect individuals from injuries caused by private actors, *DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189, 195 (1989), but a state-created danger exception to that general rule has been recognized where the state actor "affirmatively creates a danger that injures the individual," *Jaimes v. Cook Cnty.*, 2022 WL 2806462, at *3 (7th Cir. July 18, 2022). A claim under the state-created danger theory succeeds if the plaintiff shows: "(1) that [the state actor], by its affirmative acts, created or increased a danger that [the plaintiff] faced; (2) that [the state actor's] failure to protect [the plaintiff] from the danger was the proximate cause of their injuries; and (3) that [the state actor's] conduct 'shocks the conscience.'" *Id.* (citing *Estate of Her v. Hoeppner*, 939 F.3d 872, 876 (7th Cir. 2019)). Liability under the state-created danger

9

theory "has only been found under 'rare and often egregious' circumstances." *Id.* (quoting *Doe v. Village of Arlington Heights*, 782 F.3d 911, 917 (7th Cir. 2015)); *see also First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 988 (7th Cir. 2021) ("The *DeShaney* exception for state-crated dangers is narrow.").

The Seventh Circuit discussed the state-created danger exception in *Monfils v. Taylor*, 165 F.3d 511 (7th Cir. 1998). There, Thomas Monfils called the police to inform them that a fellow employee, Keith Kutska, was planning to steal an electrical cord when he left work at the James River Paper Mill in Green Bay, Wisconsin. *Id.* at 513. The police informed security at the Mill, security stopped Mr. Kutska on his way out the door, and Mr. Kutska was suspended for five days after refusing to submit to a search. *Id.* at 513. Mr. Kutska then set out to determine who had reported him to the police, and he eventually obtained a tape recording of Mr. Monfils' call from the police department even though a police officer had assured Mr. Monfils and the assistant district attorney that the tape would not be released. *Id.* at 513-15. Subsequently, Mr. Monfils was beaten and thrown into a pulp vat at the Mill with a 50-pound weight tied around his neck, where he was discovered, deceased, two days later. *Id.* at 513. Mr. Kutska and six co-workers were found guilty of murdering Mr. Monfils. *Id.* The Seventh Circuit found that the officer who assured Mr. Monfils and the assistant district attorney that the tape would not be released but did nothing to make sure it was not released was not entitled to qualified immunity because "by assuring [Mr. Monfils and the assistant district attorney] that he would make sure the tape was not released but not following through, he created a danger [Mr.] Monfils would not otherwise have faced." *Id.* at 518.

*Monfils* shares some similarities with this case. Taking Ms. Rakes' allegations as true, as the Court must at the pleadings stage, Defendants assured Amylyn that RJ would be held for 24

10

hours at the hospital and that it was safe to go home, but did nothing to make sure that he was, in fact, held for 24 hours. [Filing No. 1 at 4 (Ms. Rakes alleging that Defendants informed paramedics that RJ "got in trouble with his wife," was "having a bad day," and "wants to volunteer to get checked out," but not providing any other information or accompanying RJ to the hospital).] The affirmative act Ms. Rakes alleges is similar to the affirmative act at play in *Monfils* – assuring the victim that something would occur that would make them safe, but then not taking steps to make sure that it occurred. The Court can conceive of facts consistent with Ms. Rakes' allegations which could support a claim that Defendants violated Amylyn's Fourteenth Amendment rights by assuring her that RJ would be held for 24 hours and that it was safe for her to go home.

The Court also acknowledges the Fourth Circuit's decision in *Pinder*, however, which involved facts similar to Ms. Rakes' allegations in this case. There, officers responded to a domestic disturbance at the home of Carol Pinder. 54 F.3d 1169, 1172 (4th Cir. 1995). Ms. Pinder's ex-boyfriend had broken into her home and was abusive and violent, screaming and threatening Ms. Pinder and her children, and saying that he would murder them all. *Id.* Ms. Pinder explained to the officer that her ex-boyfriend had threatened her in the past, and had just been released from prison after having attempted arson at her house ten months earlier. *Id.* An officer questioned the ex-boyfriend, placed him under arrest, and assured Ms. Pinder that he would be locked up overnight and that Ms. Pinder would need to wait until the next day to "swear out a warrant" because a county commissioner would not be available to hear the charges until then. *Id.* Based on the officer's assurances, Ms. Pinder returned to work. *Id.* The same evening, the officer brought the ex-boyfriend in front of a county commissioner – despite telling Ms. Pinder that this would not occur until the next day – and the ex-boyfriend was only charged with misdemeanor offenses so was immediately released on his own recognizance. *Id.* The ex-boyfriend returned to

Ms. Pinder's house that evening and set it on fire, killing Ms. Pinder's three children who were sleeping inside. *Id.*

The Fourth Circuit found that the officer was entitled to qualified immunity because the constitutional right Ms. Pinder claimed was violated was not clearly established. *Id.* at 1174-75. It noted that there needed to be a "special relationship" between Ms. Pinder and the officer, and that the officer's explicit promise that the ex-boyfriend would be incarcerated overnight did not create that special relationship because there was no custodial context. *Id.* at 1175 ("Promises do not create a special relationship – custody does. Unlike custody, a promise of aid does not actually place a person in a dangerous position and then cut off all outside sources of assistance. Promises from state officials can be ignored if the situation seems dire enough, whereas custody cannot be ignored or changed by the persons it affects."). Ultimately, the Fourth Circuit's decision in *Pinder* relied at least in part on the lack of a custodial relationship between Ms. Pinder and the officers, a relationship the Seventh Circuit does not appear to require for the state-created danger exception to apply. *See Monfils*, 165 F.3d 511 (finding constitutional violation under state-created danger exception to *DeShaney* in absence of a custodial relationship between Mr. Monfils and the officer who assured him that the tape would not be released). Additionally, *Pinder* is not binding on this Court.

What *Pinder* and *Monfils* demonstrate, however, is that whether the state-created danger exception to *DeShaney* applies is a highly fact-specific inquiry. And while there are situations where the Court can conclude that a plaintiff has not adequately alleged a constitutional violation at the pleadings stage, this is not one of them. The Court can conceive of facts reasonably drawn from the Complaint which are consistent with Ms. Rakes' allegations, and which may support a viable § 1983 claim for a Fourteenth Amendment violation based on the state-created danger

exception in this case. Accordingly, the Court finds that Ms. Rakes has sufficiently alleged a § 1983 claim based on the Fourteenth Amendment and **DENIES** Defendants' Motion for Judgment on the Pleadings on that issue.

### B. Whether Ms. Rakes Has Sufficiently Alleged a Conspiracy Claim

Defendants argue that they are entitled to judgment on the pleadings on Ms. Rakes' conspiracy claim because she has not sufficiently alleged an underlying constitutional violation. [Filing No. 47 at 18-19.]

Ms. Rakes argues in response that Amylyn "suffer[ed] a constitutional injury, and [Ms. Rakes is] entitled to pursue discovery in support of the conspiracy claim." [Filing No. 48 at 14.]

Defendants do not address the conspiracy claim in their reply. [*See* Filing No. 52.]

Ms. Rakes' conspiracy claim is based on the § 1983 Fourteenth Amendment claim, and Defendants argue that it rises or falls with that claim at the pleadings stage. Consequently, because the Court finds that Ms. Rakes has stated a claim for violation of Amylyn's Fourteenth Amendment rights, it **DENIES** Defendants' Motion for Judgment on the Pleadings as it applies to Ms. Rakes' conspiracy claim under § 1985.

### C. Whether Defendants are Entitled to Qualified Immunity

In support of their Motion for Judgment on the Pleadings, Defendants argue that even if Ms. Rakes has adequately alleged that Defendants violated Amylyn's constitutional right, such a right was not clearly established because "[a]t the time of the Defendants' contact with Amylyn, no Supreme Court or Seventh Circuit precedent pronounced a due process obligation to protect a citizen from private acts of violence under analogous circumstances," and "all precedent is directly to the contrary." [Filing No. 47 at 20.]

In response, Ms. Rakes points to three Seventh Circuit cases – *Paine v. Cason*, 678 F.3d 500 (7th Cir. 2012); *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993), and *Monfils*, 165 F.3d 511 – in arguing that "the Seventh Circuit has clearly established that the Fourteenth Amendment prohibits state actors from placing victims in the path of dangerous criminal acts by third parties." [Filing No. 48 at 15.]

In their reply, Defendants argue that Ms. Rakes defines the clearly established right generally, but that she has not identified any cases involving facts similar to this case, "let alone a factually particularized case that would be necessary to put the constitutional question beyond debate." [Filing No. 52 at 13 (quotation and citation omitted).] Defendants argue that the three cases upon which Ms. Rakes relies all involved situations where the plaintiff was safe before the police acted, but that here "RJ was a danger to Amylyn before Defendants interacted with them." [Filing No. 52 at 14.]

"A public official is entitled to qualified immunity from suit unless he violated a clearly established constitutional right." *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). The qualified immunity doctrine is an affirmative defense, and "once the defense is raised, it becomes the plaintiff's burden to defeat it." *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021) (quotation and citation omitted). Granting a motion for judgment on the pleadings on qualified immunity grounds "is a 'delicate matter'" because, under the federal rules, a plaintiff is not required to "anticipate the assertion of qualified immunity by the defendant and plead allegations that will defeat that immunity." *Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000). Dismissal of a claim based on qualified immunity is only appropriate where "the plaintiffs' well-pleaded allegations, taken as true, do not 'state a claim of violation of clearly established law.'" *Hanson v. LeVan*, 967 F.3d 584, 590 (7th Cir. 2020) (quoting

*Behrens v. Pelletier*, 516 U.S. 299, 306 (1996)). Put another way, if "(1) the plaintiff[ ] adequately allege[s] facts that, if true, would constitute a violation of a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the alleged violation, such that a reasonable public official would have known his conduct was unlawful," then dismissal on qualified immunity grounds is not warranted. *Hanson*, 967 F.3d at 592.

A right is clearly established for purposes of qualified immunity where: (1) "a closely analogous case establishes that the conduct is unconstitutional"; or (2) "the violation is so obvious that a reasonable state actor would know that [his actions] violate[ ] the Constitution." *Siebert v. Severino*, 256 F.3d 648, 654-55 (7th Cir. 2001); *see also Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (constitutional right is clearly established for purposes of qualified immunity analysis if "every reasonable official would interpret [then-existing precedent] to establish the particular rule the plaintiff seeks to apply"). Moreover, the rule must "clearly prohibit the officer's conduct in the particular circumstances before him." *Wesby*, 138 S. Ct. at 590. "[E]xisting precedent must have placed the statutory or constitutional question beyond debate," *Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 987 (7th Cir. 2021), and the focus "is on whether the officer had fair notice that [his] conduct was unlawful," *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). The clearly established law "must share specific details with the facts of the case at hand." *Doxtator v. O'Brien*, 39 F.4th 852, 863 (7th Cir. 2022).

Ms. Rakes relies on three cases in arguing that Amylyn's Fourteenth Amendment right under the circumstances of this case was clearly established. First, Ms. Rakes points to *Paine v. Cason*, 678 F.3d 500 (7th Cir. 2012). There, Christina Eilman was arrested outside Chicago's Midway Airport after acting erratically. *Id.* at 503. Ms. Eilman had bipolar disorder and was "in an acute manic phase," but did not disclose her mental-health background to the arresting officers.

15

*Id.* at 504. Additionally, the officers did not believe Ms. Eilman's step-father when he told them Ms. Eilman was bipolar, nor did they record this information in Ms. Eilman's file when her mother also advised them of Ms. Eilman's mental-health background. *Id.* at 504. The officers took Ms. Eilman to a station that had a holding facility for women and, although she continued to act erratically, she was released on her own recognizance the next evening. *Id.* When Ms. Eilman left the station (without her cell phone, because officers had not returned it to her), she did not immediately leave the neighborhood, which had "an exceptionally high crime rate." *Id.* Additionally, Ms. Eilman "was lost, unable to appreciate her danger, and dressed in a manner that attracted attention," and was "white and well off while the local population [was] predominantly black and not affluent, causing her to stand out as a person unfamiliar with the environment and thus a potential target for crime." *Id.* Ms. Eilman eventually wound up at an apartment where she was raped at knifepoint and then jumped out of a seven-story window in an attempt to escape and suffered severe brain damage. *Id.* at 506. The Seventh Circuit found that the officers were not entitled to qualified immunity because "[i]t is clearly established that state actors who, without justification, increase a person's risk of harm violate the Constitution," noting that "people propelled into danger by public employees have a good claim under the Constitution." *Id.* at 510.

Next, Ms. Rakes cites to *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993). There, state troopers had arrested Cathy Irby, leaving the passenger in her car, Larry Rice, with Ms. Irby's car keys even though they should have known that Mr. Rice was intoxicated. *Id.* at 1124. Later that evening, Mr. Rice, while still intoxicated and while being pursued at a high speed by a Deputy Sheriff, collided with a car driven by Richard Reed. *Id.* at 1123. The collision killed Mr. Reed's wife and their unborn child, and injured the other occupants of Mr. Reed's car. *Id.* at 1123-24. The Seventh Circuit found that Mr. Reed's Fourteenth Amendment rights were violated because

"[t]he officers…initiated the state action, by arresting [Ms.] Irby and removing her from the car. That state intervention created the dangerous condition, a drunk driver on the road." *Id.* at 1126. The Seventh Circuit remarked that "removing one drunk driver and failing to prevent replacement by another drunk [driver] will not subject officers to section 1983 liability," but that "[i]t is the special circumstance plead in this case, that the defendants removed a driver, who it must be inferred was sober, and left behind a passenger, whom they knew to be drunk, with the car keys, that states a claim for deprivation of constitutional rights under [§ 1983]." *Id.* at 1127.

And in *Monfils*, discussed above, the Seventh Circuit found that the officer who had assured Mr. Monfils and the assistant district attorney that the tape of his phone call to police would not be released to Mr. Kutska, but then never took any action to make sure that would not happen, was not entitled to qualified immunity. *Monfils*, 165 F.3d 511.

These three cases all stand for the proposition that a state actor may not, by his affirmative acts and through special circumstances, place an individual in more danger from the acts of a private citizen than they were in before the encounter with the state actor by limiting their ability to protect themself. Much like the question of whether Defendants violated Amylyn's constitutional rights, the issue of whether such a rule is clearly established is very fact-specific. And it is one that the Court finds is not appropriately decided at the pleadings stage. Through discovery, Ms. Rakes may develop facts consistent with her allegation that Defendants' assurances to Amylyn that RJ would be held for 24 hours and that she could safely return home for the night made her less safe than she was when they first encountered her by limiting her ability to protect herself. The Court finds that Ms. Rakes has alleged enough to entitle her to that discovery.

The Court's finding comes with caution, however: the state-created danger exception to *DeShaney* is a narrow one. Indeed, the Supreme Court in *DeShaney* stated that "[t]he affirmative

17

duty to protect arises not from the State's knowledge of the individual's predicament or from its expression of intent to help [her], but from the limitation which it has imposed on [her] freedom to act on [her] own behalf." *DeShaney*, 489 U.S. at 200; *see also Sandage v. Bd. of Com'rs of Vanderburgh Cnty.*, 548 F.3d 595, 599 (7th Cir. 2008) ("When courts speak of the state's 'increasing' the danger of private violence, they mean the state did something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence.")  Further, the Seventh Circuit noted in finding that an officer was entitled to qualified immunity when a pretrial detainee under his charge escaped and terrorized hospital employees the following:

> The "state-created danger exception" to *DeShaney* does not tell any public employee what to do, or avoid, in any situation.  It is a principle, not a rule.  And it is a principle of liability, not a doctrine (either a standard or a rule) concerning primary conduct…. [W]e cannot treat the "state-created danger exception" as a rule of primary conduct forbidding any acts by public officials that increase private dangers.

*Weiland v. Loomis*, 938 F.3d 917, 919 (7th Cir. 2019).  The Court cautions Ms. Rakes that if the facts do not show that Defendants imposed a limitation on Amylyn's ability to protect herself from RJ, the state-created danger exception to *DeShaney* will not apply.  And further, even if the facts bear this out, Ms. Rakes will need to show that Amylyn's constitutional right was clearly established.  However, the Court cannot make those calls based on the pleadings alone.  *See Alcarado v. Litscher*, 267 F.3d 648, 651-52 (7th Cir. 2001) ("Because an immunity defense usually depends on the facts of the case, dismissal at the pleading stage is inappropriate: The plaintiff is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity"); *Jacobs*, 215 F.3d at 775 ("[Dismissal on the pleadings] is a mismatch for immunity and almost always a bad ground for dismissal…and when defendants do assert immunity it is essential to consider facts in addition to those in the complaint") (Easterbrook, J., concurring).  The

Court **DENIES** Defendants' Motion for Judgment on the Pleadings as it relates to whether Defendants are entitled to qualified immunity.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Motion for Judgment on the Pleadings.  [46.]

Date: 10/18/2022

*Jane Magnus-Stinson*
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**