UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| AMANDA RAKES, *Administrator of the Estate of Amylyn Slaymaker and Next Friend to the Minor Children G.C. and M.C.*, | ) ) ) ) | |
| *Plaintiff*, | ) ) | No. 4:21-cv-00114-JMS-KMB |
| *vs.* | ) ) ) | |
| JONATHAN PAUL ROEDERER and THE ESTATE OF TE'JUAN JOHNSON, | ) ) ) | |
| *Defendants*. | ) ) | |

## <u>ORDER</u>

Late in the evening on July 18, 2019, Charlestown Police Officers Jonathan Paul Roederer and Te'Juan Johnson responded to a 911 call regarding two people fighting. When they arrived, they observed RJ Slaymaker standing at the driver's side door of a car driven by his wife, Amylyn Slaymaker. After questioning RJ and Amylyn, RJ agreed to go to the emergency room for a voluntary mental health evaluation and Amylyn returned to the home that they shared. Tragically, RJ returned to their home later that evening and fatally shot Amylyn and then fatally shot himself. Amanda Rakes initiated this litigation as the Administrator of Amylyn's Estate and the next friend to Amylyn's two minor children, asserting a federal constitutional claim based on the actions of Officers Roederer and Johnson when they responded to the 911 call. Officer Roederer and the Estate of Officer Johnson[1] have now filed a Motion for Summary Judgment, which is ripe for the Court's decision. [Filing No. 67.]

---

[1] Officer Johnson passed away after the events underlying this litigation. Although his Estate is the Defendant in this matter, the Court refers to Officers Johnson and Roederer collectively as "Defendants" in this Order.

# I.
## STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). "'Summary judgment is not a time to be coy.'" *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)). Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e). And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.* The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73

(7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standard detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.    The 911 Call

On July 18, 2019 at 11:30 p.m., a man called 911 and told dispatchers that he saw a man hitting a woman in the street near his house and that, "[a]ccording to my wife, it looks like he had a gun, so tell them to be careful." [Filing No. 82-1 at 4-5; Filing No. 83-1 at 0:30-0:33; Filing No. 83-1 at 1:47; Filing No. 83-1 at 02:00-02:03.]

### B.     Officers Roederer and Johnson Arrive on the Scene

Officers Roederer and Johnson responded to 6514 Sunset Loop in Charlestown, Indiana after dispatch advised that two subjects were fighting in the street and the male subject possibly had a gun.  [Filing No. 67-1 at 3.]  When Officer Roederer arrived, he observed the male subject, later identified as RJ, at the driver's side door of a vehicle driven by a female subject, later identified as Amylyn.  [Filing No. 67-1 at 3; Filing No. 67-22 at 6.]  Amylyn immediately told Officer Johnson that RJ had a gun and said, "I'm scared for my life…. He's so sad.  He has PTSD and he – he's drunk and he's threatening to kill me and my family.  My kids live right over there."  [Filing No. 67-4 at 4-5.][2]  RJ was handcuffed and Officer Roederer spoke to him separately while Officer Johnson spoke to Amylyn.  [Filing No. 67-4 at 4; *see also* Roederer Dash Cam Video; Johnson Dash Cam Video.]

### C.     Officer Roederer Questions RJ Regarding the Encounter with Amylyn

RJ informed Officer Roederer that he was a veteran who had a hard time dealing with things and that he had a firearm on his right side in his waistband, which Officer Roederer removed.  [Filing No. 67-1 at 3; Filing No. 67-22 at 6; Roederer Dash Cam Video at 00:50-00:51; Roederer Dash Cam Video at 01:10; Roederer Dash Cam Video at 01:36-01:40.]  RJ stated that he and Amylyn had a domestic dispute and he tried to leave their house but Amylyn would not let him because she did not want him to get another DUI.  [Filing No. 67-1 at 3; Roederer Dash Cam Video at 01:18-01:35.]  RJ advised Officer Roederer that Amylyn had followed him and was trying to keep him from driving.  [Roederer Dash Cam at 01:46-01:59.]

---

[2] Defendants submitted dash cam video from both Officer Roederer's and Officer Johnson's vehicles, which the Court cites to as "Roederer Dash Cam Video," [Filing No. 67-2], and "Johnson Dash Cam Video," [Filing No. 67-3].  The Court also cites to the transcript of Officer Johnson's dash cam video, [Filing No. 67-4].

RJ stated that the dispute was not physical and denied pulling out a gun.  [Filing No. 67-1 at 3; Filing No. 67-22 at 6; Roederer Dash Cam at 02:14-02:19; Roederer Dash Cam at 02:27-02:32.]

### D.     Officer Johnson Questions Amylyn Regarding the Encounter with RJ

Meanwhile, Amylyn advised Officer Johnson that she had two guns in her purse, one of which was loaded.  [Filing No. 67-4 at 6-7.]  Amylyn explained that RJ bought her the .380 and that it "stays with me all the time," but had recently jammed so she had "grabbed the gun from the side of the bed."  [Filing No. 67-4 at 16.]  Amylyn asked Officer Johnson several times if she could have her cell phone so she could show Officer Johnson threatening text messages from RJ, but Officer Johnson told her to wait.  [Filing No. 67-4 at 6-7; Filing No. 67-4 at 9.]

Officer Johnson briefly conferred with Officer Roederer regarding what RJ and Amylyn had told each of them, and Officer Johnson then continued questioning Amylyn.  [Filing No. 67-4 at 10-12.]  The following exchange between Officer Johnson and Amylyn then took place:

> OFFICER JOHNSON:  Amy, come here.  So did – did you guys – did he hit you or anything?
>
> AMYLYN:  Yeah, he – he hit me in –
>
> OFFICER JOHNSON:  Where'd he hit you at?
>
> AMYLYN:   – the side of my – like through here with the gun, and then he punched me in – in my face, and I think he mostly got my arm.
>
> OFFICER JOHNSON:  Where'd he punch you in your face at?
>
> AMYLYN:  Like, just over here, but I – I went to block it and it's – like, it feels toward here, so I'm thinking he mostly got my arm.
>
> OFFICER JOHNSON:  Turn your head.  When did he hit you?
>
> AMYLYN:  Maybe five minutes before you guys came up.
>
> OFFICER JOHNSON:  Did you hit him or anything?
>
> AMYLYN:  No.

OFFICER JOHNSON:  Did he ever pull a gun out on you or anything?

AMYLYN:  Yeah, he – he hit me with the gun first.

OFFICER JOHNSON:  So why did – when you – did you leave your house?

AMYLYN:  Yes.

OFFICER JOHNSON:  Okay.  Why did you grab your guns?

AMYLYN:  Because he had threatened to kill my kids' dad and my kids.  So –

OFFICER JOHNSON:  Okay.  But he's – he was leaving, right?

AMYLYN:  Okay.  So – can I show you my texts?  It –

OFFICER JOHNSON:  Yeah.  Well, let's –

AMYLYN:  – makes sense –

OFFICER JOHNSON:  Well, tell me first and we'll look at your phone in a minute.

AMYLYN:  He – he – he's got a rental property on Highway 3, okay?  So he had a few drinks at the house and then he went over to the rental property.

OFFICER JOHNSON:  Okay.

AMYLYN:  Apparently drank some more and he said if I don't do something for him –

OFFICER JOHNSON:  What's –

AMYLYN:  – he's going to shoot –

OFFICER JOHNSON:  What's the something?

AMYLYN:  It's sexual stuff.

OFFICER JOHNSON:  Okay.  I mean, we're adults here.  I got to ask – we got to ask these questions, okay?

AMYLYN:  I know.  I know.  He's going to kill Eric, which is my kids' dad.  And – and – and he starts sending me pictures of him heading over here.  So I go from the house – I –

6

OFFICER JOHNSON:  Where do you live at?  Back here?

AMYLYN:  Okay.  I don't live back here.  I live in Memphis[, Indiana].

OFFICER JOHNSON:  I thought you said your family lives back –

AMYLYN:  My – my kids' dad.  That's my husband.  My kids' dad lives back there with my kids, who are at his house right now, because it's his week.

OFFICER JOHNSON:  So you dropped the kids off –

AMYLYN:  They've been over here –

OFFICER JOHNSON:  So why are you –

AMYLYN:  – since Sunday.

OFFICER JOHNSON:  So why are you over here?

AMYLYN:  Because he's threatening to shoot my f***ing kids and their dad.

OFFICER JOHNSON:  Okay….  Well, ma'am, I'm asking this question, because I'm trying to understand how come you're here.  So you came over here to check on the kids and your ex-husband?

AMYLYN:  To try to help deter him from doing anything.

OFFICER JOHNSON:  Okay.

AMYLYN:  There was another part that happened earlier.  So he FaceTimed me earlier, pretending like he shot his self.  The – the – he laid the phone facedown it looked dark.  And so I went to where he was….  By the time I got there, he had left.  So I went back home and then that's when the texts started coming about shooting Eric.  And so I came over here to try to deter him.  Originally I had pulled in behind him at the house and then he went down the road more.  And then that's where we got into the physical altercation.  And then I had backed up back to Eric's house and he had drove in beside me in that turn.  He was saying, "Do you – do you want me to shoot you?  And then the kids can come out in the morning and see their mother dead."

[Filing No. 67-4 at 12-15.]

Amylyn also showed Officer Johnson the following text exchange she had with RJ earlier that evening:

RJ:  Yep.  F*** it.  I've been looking for a reason [to] off myself.  You gave it to me.  F*** it.

AMYLYN:  I can't help it kicked me out.[3]

RJ:  Yep.  Always something.  Bye.

AMYLYN:  Are you ok

RJ:  20 mins and this time it will be for real.  Found me the perfect spot.  How the f*** is it I can talk to cats all day and then you take over and can't find anyone.  I will do gun Down Erick and….  F*** it.  Turn that sh*t over to the cops.  Guess you called my bluff snitch.  Give it 10 mins and call the cops.  Real suicide crime scene.  F*** it.  Amazing I can talk to someone all day and you take over and NOTHING but Excuses.  I'm hea[d]ing to your kids['] house.  Watch Me on gps.  Heading to your kids['] house I mean I'm [s]ick of your f***ing games.  [Always] something.  Oh you think this is a joke.

AMYLYN:  No I don't.

RJ:  [Sent pictures of the road while driving to Amylyn's ex-husband's house].  You have till 4.

[Filing No. 82-4.]  Amylyn also told Officer Johnson that she was concerned for Defendants' safety as RJ had threatened to commit "suicide by cop" if Amylyn ever called the police.  [Filing No. 67-4 at 22.]

### E.    Officer Roederer Questions the 911 Caller

While Officer Johnson was questioning Amylyn, Officer Roederer left the scene to question the 911 caller and his wife, who had seen RJ and Amylyn arguing from inside their house.  [Roederer Dash Cam at 16:59.]  The male caller advised Officer Roederer that when they first noticed the Slaymakers, RJ's car was blocking Amylyn's car and that, "[a]t first we just thought they were just kinda loud, but then we saw him reach into his waist band and start hitting, and then she started screaming."  [Roederer Dash Cam at 17:45-17-58.]  He stated that he

---

[3] Amylyn was referring to an app that RJ used to set up sexual encounters for Amylyn with strangers.  [*See* Filing No. 67-4 at 83-84.]  As discussed below, Amylyn told Officer Johnson more details regarding this after RJ left the scene.

did not see if RJ had a gun in his hand.  [Roederer Dash Cam at 18:10-18:13.]  The caller's wife told Officer Roederer that it looked like RJ hit Amylyn through the window of the car, that she heard Amylyn scream, and that she "saw him put what looked to be a gun in his waistband and then get back in the car."  [Roederer Dash Cam at 20:00-20:23.]  She stated further that although she had not seen RJ actually hit Amylyn, "[i]t looked like he had her arm above the window, because then that's when I saw the gun in his hand, or what looked to be.  And then as he came around he put it back in his waistband."  [Roederer Dash Cam at 0:21:16-0:21:24.]

### F.   Officers Roederer and Johnson Confer Again

Officer Roederer then returned to the scene and had the following exchange with Officer Johnson:

> OFFICER ROEDERER:  Well, he [the male 911 caller] basically said they were parked right in front of their house and they heard them screaming.  They said they looked like he was punching something, but they couldn't – never saw him actually hit her.  They said, "Yeah, we saw his arms going up, but didn't see him hit her."  So I asked the guy, I said, "Well, so what about the guns?"  He said, "Well, I don't know for sure if it was a gun.  I saw" – then he said, "I saw – I saw him, like, reach for his waistband and I kind of figured it was a gun."  And then the wife came out and said that she thought she saw a gun.  She's like, "I don't know for sure it was a gun."  So –
>
> OFFICER JOHNSON:   The text messages, he never threatened to kill her.  Because on the text messages, you know, he threatened – or he just told – basically, you know, mad at the – her ex-husband.  I didn't see no marks or bruises on her.
>
> OFFICER ROEDERER:  No, I didn't see any –
>
> OFFICER JOHNSON:  If he punched her –
>
> OFFICER ROEDERER:  If he just punched her five minutes ago… – especially with a gun – …she's going to have a bruise.
>
> OFFICER JOHNSON:  A mark here and then a mark on her face.  Did he pull – he said he pulled a gun out on her, yeah?
>
> OFFICER ROEDERER:  He said he did not.

OFFICER JOHNSON:  He didn't?

OFFICER ROEDERER:  So then I went ahead – I was asking if she pushed him and so I was like, "Yeah, I better read him his rights."  Because obviously we've got – … an issue with a gun, so I went ahead and read them.  He was like, "All right.  I'm going to talk – you know, I'll talk to my lawyer about it."  So he quit talking.

OFFICER JOHNSON:  And then they – they've both got guns.

OFFICER ROEDERER:  I'm like, "Don't worry about it."  And then he quit talking.

OFFICER JOHNSON:  And then they – they both got guns.  She's got a loaded gun in her purse.

OFFICER ROEDERER:  Yeah, I know.  So I mean, at most, we can get him for [public intoxication], I guess.  I would – … get him for [driving under the influence], but I mean –

OFFICER JOHNSON:  Yeah, but if he's trying to get away –

OFFICER ROEDERER:  Yeah, I know.  He's trying to get away from the situation.

OFFICER JOHNSON:  Right.

OFFICER ROEDERER:  That's what he was telling me.  He said, "I'm just trying to get out of here and she's following me.  That's why I stopped and was telling her to quit following me."… That's why he stopped right there… – and walked back and told her to quit following him.

OFFICER JOHNSON:  That's – and that's what I'm telling her.  I'm like, "Why is his car there and why is your car here?"  I – I don't think we got nothing.  I don't think we got nothing.  I told her, that's what I said.  I said, "Ma'am."  I said, "I don't think we have enough to do anything."

OFFICER ROEDERER:  Yeah.  I mean, we have no – … We see no marks….  The witness statements weren't completely –

OFFICER JOHNSON:  I'm like, "If you're scared, why are you coming back up here?  Why do you not just leave and go the other way or stay down there and wait for the police to come?"  And why did she not call the police?

10

OFFICER ROEDERER:  And if – and if she saw him sitting right there and she knows he's crazy and got a gun, why don't you drive off?  You've got plenty of room right there.  I mean –

OFFICER JOHNSON:  I don't think we got enough, bro.  I'm going to talk to her.

[Filing No. 67-4 at 23-26.]

Officers Roederer and Johnson then discussed confiscating the Slaymakers' guns for "safekeeping," so that both RJ and Amylyn could "cool down."  [Filing No. 67-4 at 27.]

**G.    Officer Johnson and Amylyn Continue Talking About RJ**

Officer Johnson then told Amylyn that because the 911 callers did not see what had happened, they were not going to arrest RJ but would take custody of the Slaymakers' guns for the night.  [Filing No. 67-4 at 27-28.]  Amylyn asked Officer Johnson if they could also take custody of two AR-15 assault rifles that they had in their home.  [Filing No. 67-4 at 28-29.] Amylyn and Officer Johnson discussed where Amylyn and RJ would go for the night:

OFFICER JOHNSON:  Is there a place where you can go for the night?

AMYLYN:  Maybe my parents'.

OFFICER JOHNSON:  Can you go there?

AMYLYN:  But I don't trust to leave him at the house alone.  Years ago, he threatened – he literally tried….  He set fire to the couches –.

[Filing No. 67-4 at 28-29.]  Officers Roederer and Johnson discussed the possibility of Officer Roederer giving RJ a ride to the Slaymakers' house in Memphis while Amylyn went to her parents' house for the night, and Officer Johnson and Amylyn then had the following exchange:

OFFICER JOHNSON:  Hey, ma'am, he has nobody that he can – he has no family?

AMYLYN:  Not around here.

OFFICER JOHNSON:  And where's your mom and dad live at?

11

AMYLYN:  In New Albany.

OFFICER JOHNSON:  You think he'd go to New Albany and do –

AMYLYN:  Huh?

OFFICER JOHNSON:  They live in New Albany?

AMYLYN:  Yeah.

*               *               *

OFFICER JOHNSON:  Yes, ma'am.  I'm going to – we're going to go get the guns and he's going to stay at the house.

AMYLYN:  He's going to stay – well, I don't – he's choked me.

OFFICER JOHNSON:  Okay.  But you're going to your parents' house.

AMYLYN:  Well, what if he burns the house down?

*               *               *

OFFICER JOHNSON:  Listen to me – ma'am, worry about you.  Don't worry about him.  That's what – we're dealing with you, okay?

AMYLYN:  Okay –

OFFICER JOHNSON:  Listen, we're dealing with you though, ma'am.

AMYLYN:  I know, but –

OFFICER JOHNSON:  You need – we – you've got –

AMYLYN:  – you know, my kids come to my house.  What am I supposed to do if my house gets burned down?  What am I supposed to do?

OFFICER JOHNSON:  Okay.  Do you feel comfortable – so do you want to be at your house by yourself or do you want to go somewhere else?  Okay.  Then that's what we need to do, okay?  Right – listen, right now, we have nothing to – to arrest him on, okay?  You know, you're telling me a story and I'm looking out for your interest of where you feel safe.  So you can be at your house where there's other people – you can always build your house up if something happens to your house.  You can always fix your house.  Then if he burns your house down, then he'll go to jail for arson.  So that can be replaced.  A home can be replaced.  Your life can't.

12

AMYLYN:  So what am I supposed to do tomorrow and the next day?

OFFICER JOHNSON:  You know there's a problem.  Then you need to –

AMYLYN:  I know there's a problem

OFFICER JOHNSON:  Then you need to go to court, get an EPO, a no-contact order.  You guys need to split up, okay?  That's what you need to do as an adult.  You have kids, okay?  So you guys need to act as an adult.  If you know this is a history, where he's burning the couch up, if he's threatened you, if you think he's going to harm you, why put your kids in harm's way?

AMYLYN:  But –

OFFICER JOHNSON:  No, there's no excuses –

AMYLYN:  Who's going to protect them –

OFFICER JOHNSON:  Ma'am, what do you mean who's going to protect them?  You are.

AMYLYN:  Whenever they're over here.

OFFICER JOHNSON:  They got a dad over here.  Call the police.  We can't be here 24-7.  Nobody can be present 24-7.  But you got to take the first step.  If you know this is not working out and it's getting to this point, you need to go to court, file for a divorce, get an EPO, a no-contact order, and leave this alone.  Be through with it.  So don't make excuses up, "Well, I care for him, this and that."  It's not – it's to the point where if it's not going to work out, you're going to have to go your separate ways.  If he wants to harm his self – if he doesn't want help, ma'am, you can't help him.  It's up to him if he wants help.

AMYLYN:  I know.

OFFICER JOHNSON:  But if your kids were here and if you guys got in a fight, this would have been a totally different situation.  [Child Protective Services] gets involved, your kids are going to be taken away.  There's a lot of things that could happen.  You – first of all, you have a loaded gun, he has a gun.  I mean, this is crazy.  I shouldn't have to be telling you this.  This stuff is common sense.

AMYLYN:  I know, but –

OFFICER JOHNSON:  You know, how old are you?

AMYLYN:  38 – or 39.

13

OFFICER JOHNSON:  Okay.  So you're almost 40 years old, right?

AMYLYN:  Yeah.

OFFICER JOHNSON:  So this is common sense.

AMYLYN:  It is, but when you have somebody threatening you, like –

OFFICER JOHNSON:  Ma'am, if he was –

AMYLYN:  – you feel helpless and you don't know what to do.

OFFICER JOHNSON:  You could have backed up and called the police.  If somebody was threatening me, I'm going to get away from the situation and I'm going to call the cops.

AMYLYN:  If I call the police, he'll threaten to do it even more.  It –

OFFICER JOHNSON:  Okay.  Then – then what do you – ma'am, then what do you – then what do you want to do?  No, it isn't a normal situation.  I'm not going to be in an abusive – abusive relationship.  I'm going to get out of that situation.

\*              \*              \*

AMYLYN:  Where you're going to go?....  Because I have to go get my dog and I have to get….

OFFICER JOHNSON:  Okay.  He's not going to the house right now.  He's going to go to the police station.  I'm going to follow you to your house.  I'm going to get the other two guns, wait until you get your stuff.  And then when you leave, he's going to go back to the house.

AMYLYN:  Okay.

OFFICER JOHNSON:  And so at that point, you know, it's going to be up to you.  You – here's the steps you got to – this conversation is being recorded, okay?  It's going to be up to you to go up to the courthouse tomorrow, okay?  And get a – to either get a no-contact order, an EPO, or get a divorce, okay?  So this whole conversation that we're having, it's recorded.  So there's no misunderstanding, no miscommunication.  You know, you have to do that.  Him and I, we don't know – he's telling a story, you're telling a story.  We was not here.  We talked to the other parties that was involved.  Their story is not clear.  So that's why we don't feel comfortable with…arresting anybody tonight.

AMYLYN:  Okay.

OFFICER JOHNSON:  Okay?  You know, it's not that we don't believe you or we don't believe him.  It's just that we don't see the evidence there.

AMYLYN:  I understand.

OFFICER JOHNSON:  Okay?  But you should not be in an abusive relationship if he's putting his hands on you and if he's abusing you.  There's places you can go.  Granted, you know, it's a piece of paper, an EPO.  If he wants to harm you, you know, that's not going to keep him away from you.

AMYLYN:  I know.

OFFICER JOHNSON:  So when he speaks with him, he's going to talk with him and let him know.  He shouldn't be putting his hands on you, okay?  You know, unfortunately, you know, we can't stop this man if this man wants to end his life.  I mean, there's nothing that we can do.  We can talk to him until we're blue in the face.  He told [Officer Roederer] that he was not suicidal…..  But you have to worry about yourself and your kids, okay?

AMYLYN:  Okay.

OFFICER ROEDERER:  You know what an [mental inquest warrant] is in the hospital?  If you go down to the courthouse and tell them what's going on, and – has he ever been in, like, the hospital for, like, a mental evaluation or anything like that?

AMYLYN:  Not that I know of.

OFFICER ROEDERER:  So you go down to the courthouse and talk to them about what's going on, and then they can even get, you know, paperwork – because we'll do a little narrative and everything of what happened tonight and your statement, his statement, and that'll be in there and you can take it down to the courthouse and say, "This guy is suicidal.  He's threatening his life, your life, and everything else."  And they'll look into getting an MIW warrant, a mental inquest warrant.  So they will, if they provide it, they'll come get him –

AMYLYN:  I have proof that he tried to attempt suicide before.  Will that help?  I have a – he had sent me a picture of his gun against his head recently.

OFFICER JOHNSON:  Yeah, I mean, it sounds like it would help.  So why are you waiting – I mean, we can't do it today.  It's after –

AMYLYN:  I honestly, I don't know what to do.  I don't know how to help him.  I don't – … It – it's really –

OFFICER JOHNSON:  But listen –

OFFICER ROEDERER:  Well, I'm trying – I'm trying to tell you –

OFFICER JOHNSON:  Ma'am, listen –

OFFICER ROEDERER:  I'm trying to tell you and you just interrupted my whole thing.

AMYLYN:  Well, I meant, like –

OFFICER ROEDERER:  So do you want help or not?  Like –

AMYLYN:   – when you-all….   Because I mean, tomorrow it's going to be …something different.

OFFICER JOHNSON:  But ma'am, listen.  What he's – Amylyn?

AMYLYN:  Uh-huh.

OFFICER JOHNSON:  Listen to what he's trying to explain to you, ma'am.

OFFICER ROEDERER:  So you go and get a mental inquest warrant.  They will come pick up, take him to the hospital, make him stay for a whole week.  They're going to evaluate and test him to see if he's mentally stable, okay?  And then they go from there, okay?  They can get him on medication, they can get him help or whatever he needs.  But that's how – that's how you got to do it, okay?

OFFICER JOHNSON:  And I know you don't – I know you don't want to take his guns away, because that's going to take his guns away.

AMYLYN:  I know.

OFFICER JOHNSON:  His Second Amendment Right, I know – but you got to worry about you.  Everything we're telling you, it's like you don't want to do it.  Like, you're kind of hesitant about doing it.

AMYLYN:  I am hesitant to do it because he served our country.  You know, it's like – ….  For him, it's a slap in the face.  It really is.

OFFICER JOHNSON:  Why are you –

OFFICER ROEDERER:  But then you need to get him help.

AMYLYN:  I understand that, but –

OFFICER ROEDERER:  If this is what he keeps doing, then he's – then he could kill himself.  Then how would you feel if you didn't get him help?  If – if you

16

knew what was going on and you didn't do anything about it and he did something, how would you feel?  Think about that.

AMYLYN:  I mean, I'd feel bad either way.

OFFICER ROEDERER:  Well, you're not – you don't care what we're talking about.

OFFICER JOHNSON:  Right.  I mean – right.  And we're not – we're not laughing at you.  It's just, like, we're trying to help you and it's like –

\*                    \*                    \*

OFFICER ROEDERER:  But once he gets help, he will realize that you did the best thing for him –  … because he's still alive.  He didn't do anything –

OFFICER JOHNSON:  We're trying to make you – we're trying to make you understand reason.  You know –

AMYLYN:  I understand that, but I'm – I'm just – honestly, I'm just sad.

OFFICER JOHNSON:  Okay.  We don't want anything to happen to you all because you feel that he did something great for our country.  It's great that he did that.  He fought for our country.  But is that more important than your life, your kids – seeing your kids grow up…?  I mean, to me, that'd be more important than worrying about his issues.  You now, I'd be like, "Man, you need to get help."

[Filing No. 67-4 at 31-45.]

## H.  RJ Agrees To Go To the Hospital

Amylyn then showed Officers Johnson and Roederer a picture from her phone of RJ holding a gun to his head.  [Filing No. 67-4 at 46-47.]  After seeing the picture, Officer Johnson talked to RJ about going to the hospital to "get checked out," and RJ expressed concern that his guns would be taken away.  [Filing No. 67-4 at 48-52.]  He told the Officers that he fought for his Second Amendment right and "will be damned that I'll give that f***ing right up, that I fought for, that 14 of my f***ing brothers died for, and you're holding a f***ing phone that shows evidence of me having a bad day.  You know how many times I have a bad day?  All the time.  You know how many times I do that?  Very rarely.  But you know what happens?  You

17

submit that in your report and all they see is one time.  And guess what.  Red Flag Law takes that away from me.  I would rather die right now fighting you motherf***ers, with my hands behind my back, than give that right up."  [Filing No. 67-4 at 59.]

Officer Roederer told RJ, "if we make you go [to the hospital], they make you stay there for a whole week….  If we don't, you don't have to stay in there.  They don't keep you for a whole week, okay?  So it's – it's easiest just to voluntarily –."  [Filing No. 67-4 at 53.]  RJ agreed to go to the hospital voluntarily if Officers Johnson and Roederer did not show medical personnel the picture of him holding a gun to his head and the Officers agreed.  [Filing No. 67-4 at 52-53.]  RJ and the Officers had the following exchange:

> RJ:  Okay.  Well, I'll tell – I'll – okay, so one on one, if I was to go tonight, EMS shows up, I go down to the hospital, I get evaluated –
>
> OFFICER JOHNSON:  I'm going to tell EMS – this is what I'm going to tell EMS, that you guys got in an argument, you have some problems, that you want to talk to somebody, because you said you want to voluntarily go.  And that's confidential what you want to talk to them about.
>
> RJ:  Okay.
>
> OFFICER JOHNSON:  Okay?
>
> RJ:  Can you shake my hand on that?
>
> OFFICER JOHNSON:  Because I want you to get help.
>
> RJ:  You know what?  I can respect that, 100 percent.
>
> OFFICER JOHNSON:  Okay.

[Filing No. 67-4 at 62-63.]  Officer Roederer told RJ, "Yeah, man, we don't – we don't, like, want to take people to jail, especially in your situation.  We understand and we appreciate that you gave your life for everything that we have, and we understand that.  We're here for you. We're – like I said, we – we could have you for a felony DUI – …public intoxication and

everything else, but we're not – we don't want to take you to jail if we don't have to."  [Filing No. 67-4 at 72.]

　　　When an ambulance arrived, Officer Johnson had the following exchange with EMS personnel:

> OFFICER JOHNSON:  This is RJ
>
> EMS PERSONNEL:  Okay.
>
> OFFICER JOHNSON:  Man, he got into it with his wife.  He was having a bad day.
>
> EMS PERSONNEL:  Okay.
>
> OFFICER JOHNSON:  Problems – you know, he wants to voluntarily get checked out.
>
> *　　　　*　　　　*
>
> EMS PERSONNEL:  Okay.
>
> OFFICER JOHNSON:  And then just go with them [to] talk to somebody down there.
>
> EMS PERSONNEL:  All right.  Let's go.

[Filing No. 67-4 at 74-75.]

### I.    Officer Johnson and Amylyn Discuss Where She Will Go For the Night

　　　After RJ left in the ambulance, Officer Johnson and Amylyn had the following discussion regarding where she was going to go for the night:

> OFFICER JOHNSON:  Are you going to go to your house?  You're – you're going to be at your parents' house?
>
> AMYLYN:  Well, you – you said it's a 24-hour thing, right?  For an evaluation?
>
> OFFICER JOHNSON:  Yeah, so what are [you] going to do?  Are you going to go to your house?....  So here's what I'm – here's what I'm going to do.  I'm going to leave the – I'm going to leave your gun, okay?  We have his gun.  (Inaudible) going to your house because I don't think you're suicidal.

19

AMYLYN:  I'm not, no.

OFFICER JOHNSON:  Okay.  I'm going to give you back your firearm, okay?
Did he ever say he pulled out the firearm?

OFFICER ROEDERER:  No, he didn't.

OFFICER JOHNSON:  Okay….  Yeah,  So here's your – your bag and your
license and stuff.

AMYLYN:  I – and I – I understand why he feels that way, but I want to help him
and – and I've been trying to talk him into – he went to his first AA meeting
Monday.  And I – I'm trying to do all I can within reason, but I – I don't want to
go to these extents.  I – I want him to, you know – not be in the criminal system.
But – …everything to just pass over and –.

OFFICER JOHNSON:  But ma'am, but it's hard to reason with somebody who's
so adamant about their Second Amendment Rights.

AMYLYN:  I know.

[Filing No. 67-4 at 77-79.]

Amylyn then told Officer Johnson that RJ had been insisting that she engage in sex acts

with other men for the past three years and that earlier that evening RJ was "bitching and

complaining" regarding an encounter that he wanted Amylyn to follow through with, but that she

did not carry out.  [Filing No. 67-4 at 81-86.]  Officer Johnson again told Amylyn that she

needed to leave RJ.  [*See, e.g.*, Filing No. 67-4 at 86 ("OFFICER JOHNSON:  Here's the thing –

all right, Amy, here's the thing, okay?  If somebody's shooting at you, okay, it's time to go.").]

They again discussed where Amylyn would go for the night:

OFFICER JOHNSON:  But the steps – but you're still going to be involved in that
situation.  You need – if you leave and go to your mom's house, get away from
that situation.

AMYLYN:  But then he's going to threaten Eric and the kids or threaten to come
to my parents'….  I just feel like I – I'm – I'm feeling a little stuck, and – and I
know that's probably hard for you to understand –

OFFICER JOHNSON:  It's not – I do – I do understand.

AMYLYN:  – because you haven't been in that situation.

OFFICER JOHNSON:  But I do – I do understand.  And you know what?  I have not been in that situation, but I understand as a female, even for you, it probably is hard for you, because you are probably stuck.  And, you know, but there is places out there that can help you in your situation though.

AMYLYN:  Yeah but, you know, it's not just me.  It's me here, the kids here, my parents there….  I mean, the other day, he even threatened to shoot the dog…..  And it's, like, I don't feel like I can protect everybody.  So if I try to protect myself, I feel like I'm potentially putting the kids in harm's way or my parents in harm's way.

OFFICER JOHNSON:  I mean, so do you want to get help?

AMYLYN:  I – I do need help, yes.  And that's why I – I provided you all that information tonight.  I know – part of me – …just wants to say one day, it's just going to all change and everything's going to get better.  But I'm to the point now, I know it's not and I don't know what else to – to do to try to get him help.

OFFICER JOHNSON:  Well, we're talking about you.  Have you ever thought about, like, you know –

AMYLYN:  I know, but he needs help, too….  Because I feel if he doesn't get help, I'm going to – I'm going to be in danger.

OFFICER JOHNSON:  That's why we're – that's why he's at the hospital trying to get help, okay?  But it also starts with you, okay?  You know, you can't have your kids in that situation, okay?...You can't have yourself in a bad situation.  So to get help is – there's places out there, you know, for women and children centered, that can help, you know, your situation and your case.  But it has to be something that you want to do and not, you know, feel obligated that you want to help him.  I mean, so there's places out there.  So basically he got upset because, you know, you got kicked out of this app and you couldn't meet with this guy to have sex.  So from there, he got mad and said that he's going to shoot Eric, okay.  So then you came over here to where Eric was at.

[Filing No. 67-4 at 88-90.]

Amylyn told Officer Johnson more details regarding RJ wanting her to engage in sex acts with other men, confirmed that she did not want to do so, and stated, "like, that's why I feel stuck, because I – because if I don't do it, it's, 'I'm going to shoot you, I'm

21

going to shoot me.'  I'm – I mean, I – we've – recently, I think there's been two or three times when divorce has, like, been to the point where we had papers, we signed, and were trying to figure everything else out.  And then he'll, you know, the next day rip them up and he's like, 'No, I'm not going to do that to you.  I'm going to go get help.'  And, you know, I've checked out this…place, but Monday was the first time he actually went to it….  He's been drinking real heavily since, like, November or December."  [Filing No. 67-4 at 94.]

They again discussed where Amylyn would stay that evening:

OFFICER JOHNSON:  Okay.  So do you want to stay there [at your house]?  Or do you want to – I mean, what – what's the plan?  Like, what –

AMYLYN:  I'm going to have to stay with my parents, I guess.

OFFICER JOHNSON:  Okay.  So are you going to go to your house?

AMYLYN:  Well, tonight, yeah.

OFFICER JOHNSON:  Are you going to –

AMYLYN:  You said it's a 24 hour?

OFFICER JOHNSON:  Yeah.  So are you going to get the guns and everything when you go home?

AMYLYN:  Yeah, I'm going to take them with me to my parents'.

[Filing No. 67-4 at 96-97.]

Officer Johnson then accompanied Amylyn to her ex-husband's house to let him know what had taken place, and then they left the scene separately.  [Filing No. 67-4 at 98-101.]

## J.    Amylyn Contacts Officer Johnson and Goes to the Police Station

A few minutes after leaving the scene, Amylyn called Officer Johnson to tell him that she had found a scratch on her left arm.  [Filing No. 82-8 at 20.]  Officer Johnson asked her to come to the police station so that he could take a picture of the scratch and also told her that he

"needed those text message[s] where [RJ] had been threatening her" by the next day, so that he could complete his report of the incident.  [Filing No. 82-8 at 20.]  Amylyn went to the police station and showed Officer Johnson the scratch on her left arm, and he took a picture.  [Filing No. 82-8 at 20.]

As for where Amylyn was going to stay that evening, Officer Johnson wrote in his report of the incident that when Amylyn called to tell him about the scratch on her arm, he told her to "make sure to get the other two AR15s and stay at her mother['s] house," and that Amylyn responded, "okay."  [Filing No. 82-8 at 20.]  He also wrote the following regarding his conversation with Amylyn while she was at the police station:

> Amylyn then told me that she made her mind up and that she was going to get an EPO and file for divorce.  Amylyn asked officers again how long will [RJ would] be in the hospital.  Officers told Amylyn we did not know how long he will be in there.  I told Amylyn do not worry about how long [RJ] is going to be in the hospital.  I told Amylyn this is [a] chance to get her stuff together and to go her mother['s] house.  Amylyn stated "okay", but it's hard I love him and he needs help.  I told Amylyn to go to her mother's house.  I told Amylyn she needed to follow through with this and think about her and her kids because something bad could happen.  Amylyn [stated] "okay".  I asked Amylyn again if she was going to her mother's house.  Amylyn stated "yes".
>
> Note:  Amylyn asked several times how long will [RJ would] be in the hospital.  Officers told her we did not know.  I told Amylyn if she needed anything to contact me.  Amylyn stated "okay".

[Filing No. 82-8 at 20.][4]

### K.    RJ's Emergency Room Encounter

Meanwhile, RJ was admitted to the emergency room at Clark Memorial Hospital at 12:59 a.m. on July 19, 2019.  [Filing No. 82-6 at 26.]  The emergency room records state:

---

[4] Officer Johnson had not filed his report of the July 18, 2019 incident as of the time that RJ killed Amylyn, as discussed below.  [Filing No. 83-2 at 0:32-0:38; Filing No. 83-2 at 02:10-02:20.]

> Patient in argument with his wife earlier this evening heated argument in the
> streets neighbors called the police police came to the scene spoke with the
> patient…they found out he was a veteran and owns a handgun it was not used
> during the argument was not removed during the argument he did not threaten
> anyone with this he has no desire to hurt himself or his wife simple fact that he
> was a veteran of war owns a handgun the police wanted him to be evaluated
> before returning home.

[Filing No. 82-6 at 26.]  RJ's blood alcohol content in the emergency room as 0.12.  [Filing No.
82-6 at 28.]  He was discharged at 3:41 a.m. on July 19.  [Filing No. 82-6 at 26.]

**L.     Amylyn and RJ are Discovered Dead at Their House**

On the evening of July 19, 2019 at approximately 9:36 p.m., RJ's mother called 911 to
request a welfare check at the Slaymakers' house because RJ had sent her a message on
Facebook at 7:49 that evening stating that he had killed Amylyn and was planning to kill
himself.  [Filing No. 67-10 at 1-2; Filing No. 67-10 at 8; Filing No. 67-14 at 6; Filing No. 67-14
at 28.]  The text message stated:

> I killed amylyn and now myself.  I am writing this as my last words.  I am sorry.
> Please make sure I get a proper [burial].  Cause no one here will cause of what I
> did.  I'm sorry.  Wish I could change what I did.  But I did it in the heat of the
> moment and can't go back and fix it….  Sorry to let you down….  I love her so
> much and she f***ed up.  It killed me inside and I ended her….  I am broken and
> did something I am not proud [of].   She was my world.   But screwed me.
> Screwed me so bad I had to resort to this.

[Filing No. 82-11.]  At approximately 11:43 p.m. that evening, RJ's mother received another
message from RJ in which he stated, "I'm not going to prison.  Amylyn is dead.  And so am I.
Bye and I love you."  [Filing No. 67-11 at 6.]

Clark County Sheriff's Officers responded to the Slaymakers' house and eventually
entered the house through the garage at approximately 1:15 a.m. on July 20.  [Filing No. 67-10 at
1-2; Filing No. 67-12 at 1; Filing No. 67-14 at 8-9.]  Clark County Sheriff's Detective James
Haehl discovered RJ seated in a chair inside the garage, deceased, with an injury to his head, a

large amount of blood pooled on the floor, and a Glock .40 caliber pistol lying in RJ's lap. [Filing No. 67-12 at 1.]  Detective Haehl then went into the house and saw a mattress in the living room with a blanket on it and Amylyn's body lying on her right side clutching what appeared to be a cell phone.  [Filing No. 67-12 at 1.]  He observed what appeared to be a gunshot wound to the left side of her head.  [Filing No. 67-12 at 1.]  Detective Haehl also observed an AR-15 style rifle lying on a couch near Amylyn, along with four other firearms in the house. [Filing No. 67-12 at 2.]

### M.    Prior Threats By RJ

RJ had physically threatened Amylyn on several occasions prior to the July 18, 2019 incident, including the following:

- March 3, 2019:  Amylyn shot RJ in self-defense at their house.   RJ acknowledged in a voicemail message he left for Amylyn that Amylyn was scared for her life and warned her that, based on his military training, if he really wanted to do something to her, he would do it while she was sleeping and not when he could have gotten shot or hurt.

- July 4, 2019:  RJ sent Amylyn text messages stating:

  o "But you walk in this door after f***ing me over I'll f***ing shoot you…";

  o "Either do what I asked or don't come home.  I'll break your f***ing jaw you walk in my f***ing house without completing my dare";

  o "And you can show this to the cops snitch.  Come home and not complete sh*t, you will be in the hospital";

  o "F*** the cops, f*** the feds, I'll f*** you up if you come home and leave me hanging."

- July 13, 2019:  Amylyn sent RJ a text message stating, "Sex stuff is not why I want to leave you.  You keep pulling a gun on me is.  I'm done being threatened.  Do you have a different fix for that?"

[Filing No. 67-17 at 1; Filing No. 67-18 at 2; Filing No. 67-19 at 2; Filing No. 67-20; Filing No. 67-21 at 7-8.]

After her death, police found a letter Amylyn had written on July 10, 2019 stating that if something happened to her, the letter should be given to authorities.  [*See* Filing No. 67-17.]  In the letter, she wrote that RJ had been abusive and threatening for the past six to eight months and had recently threatened to kill her, her children, and the family dog.  [Filing No. 67-17 at 1.]  She wrote that she was trying to get RJ help for his PTSD and drinking, but that she could not talk to anyone about it out of fear that RJ would find out.  [Filing No. 67-17 at 1.]  She wrote that she wanted to call the police, but that RJ threatened to shoot the police if they responded and she did not want anyone to get killed.  [Filing No. 67-17 at 1.]

### N.    The Lawsuit

Ms. Rakes initiated this lawsuit on July 15, 2021, as the Administrator of Amylyn's estate and as next friend to Amylyn's minor children.  [Filing No. 1.]  She asserts claims against Defendants: (1) under 42 U.S.C. §1983 for violation of Amylyn's Fourteenth Amendment rights by "affirmatively plac[ing] Amylyn in a heightened state of special danger that Amylyn would not otherwise have faced when they falsely told Amylyn that RJ would be in the hospital for 24 hours and it was safe to return home," because "[i]t was foreseeable that RJ would return to the home and harm Amylyn during the 24-hour period that Amylyn thought RJ would be hospitalized"; and (2) under 42 U.S.C. § 1985 for conspiring to deprive Amylyn of her constitutional right to equal protection because Amylyn "was a member of a protected class" and Defendants' actions "were motivated by discriminatory animus toward Amylyn's gender." [Filing No. 1 at 6-7.]

On October 18, 2022, the Court denied a Motion for Judgment on the Pleadings filed by Defendants. [Filing No. 63.] Defendants have now moved for summary judgment on all of Ms. Rakes' claims. [Filing No. 67.]

### III.
### DISCUSSION

**A.     Section 1983 Fourteenth Amendment Due Process Claim**

In support of their Motion for Summary Judgment, Defendants argue that they did not violate Amylyn's constitutional rights. [Filing No. 70 at 33.] Specifically, they assert that Ms. Rakes claims that they had a constitutional duty to protect Amylyn against another private citizen's acts of violence, but that the United States Supreme Court rejected that theory in *DeShaney v. Winnebago Cnty. Dept. of Social Servs.*, 489 U.S. 189 (1989). Defendants contend that Ms. Rakes does not argue that the first exception to *DeShaney*, which applies when the state has taken a person into its custody involuntarily, applies here and that Amylyn was never handcuffed or detained in any event. [Filing No. 70 at 15-16.] As to the second exception to *DeShaney* – the state-created danger exception – Defendants argue that the exception is narrow and only applies where the plaintiff can show that "the state affirmatively placed [her] in a position of danger and that the state's failure to protect [her] from that danger was the proximate cause of [her] injury." [Filing No. 70 at 17 (quotation and citation omitted).] Defendants assert that courts should "avoid mechanically applying a multi-part test" to the issue of whether the state-created danger exception to *DeShaney* applies and instead focus on "the State's affirmative act of restraining the individual's freedom to act on his own behalf – through incarceration, institutionalization, or other similar restraint of personal liberty." [Filing No. 70 at 19 (quotation and citation omitted).] Defendants argue that they did not create a danger to Amylyn, asserting that RJ had been abusing and threatening Amylyn for six to eight months prior to the July 18,

2019 encounter – including shooting at her, choking her, threatening her, and threatening to burn their house down – and that Amylyn had continued to live with RJ.  [Filing No. 70 at 21.]  As to Ms. Rakes' contention that Defendants affirmatively placed Amylyn in a heightened state of danger by falsely telling her that RJ would be in the hospital for 24 hours and that it was safe to go home, Defendants argue that "false assurances of protection are not affirmative acts that can trigger the state-created danger exception."  [Filing No. 70 at 22.]  They also argue that Ms. Rakes' position is factually flawed because Officer Roederer never said anything to Amylyn regarding how long RJ would be in the hospital and whether it was safe for her to go home, and although Officer Johnson answered "yes" when Amylyn asked if the hospitalization was "a 24-hour thing," he also instructed her multiple times to get the assault rifles and personal items from her house and go to her parents' house.  [Filing No. 70 at 22-23.]  They assert that they did not tell Amylyn it was safe to go home, that even if they had, "there is no basis to conclude that things would have turned out differently," and that "the already-existing, violent nature of RJ" was what created the danger to Amylyn.  [Filing No. 70 at 23.]  Defendants note Ms. Rakes' concession that it is likely that RJ would have remained a threat to Amylyn more than 24 hours after the July 18 encounter.  [Filing No. 70 at 23.]  Defendants also argue that any failure to follow internal procedures cannot support a claim that Amylyn's Fourteenth Amendment rights were violated and that Ms. Rakes cannot show that Defendants "cut off Amylyn's avenues of aid."  [Filing No. 70 at 24-25.]  They assert that their conduct was not the proximate cause of Amylyn's death and was not conscience shocking.  [Filing No. 70 at 26-30.]  Finally, Defendants argue that they are entitled to qualified immunity because the law establishing a constitutional violation was not clearly established and "[n]o case law put [them] on notice that their July 18-19, 2019 conduct violated Amylyn's clearly established Fourteenth Amendment [r]ights."  [Filing

No. 70 at 34.] They assert that "the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability," and that at the time of their contact with Amylyn, "no Supreme Court or Circuit Court precedent pronounced a due process obligation to protect a citizen from private acts of violence under analogous circumstances." [Filing No. 70 at 34-35.] Defendants point to *Weiland v. Loomis*, 938 F.3d 917 (7th Cir. 2019), for the proposition that courts "cannot treat the 'state-created danger exception' as a rule of primary conduct forbidding any acts by public officials that increase private dangers." [Filing No. 70 at 35 (quotation and citation omitted).]

In her response, Ms. Rakes argues that Defendants "took affirmative steps that put Amylyn in exceptional danger in the hours before her murder" when Officer Johnson "told her that RJ would be hospitalized for 24 hours at least twice," and Officer Roederer "stood by silently affirming the lie." [Filing No. 84 at 12.] Ms. Rakes asserts that Defendants "made arrangements to conceal RJ's conduct from medical providers and other law enforcement so that he could leave the hospital whenever he liked," and that they did not tell Amylyn that RJ would be returning home when she told them she was going to go home. [Filing No. 84 at 12.] Ms. Rakes contends that Defendants' conduct was the proximate cause of Amylyn's death because "the most dangerous time for a victim of domestic violence is when she decides to leave the relationship" and "Amylyn [was] part of a foreseeable class as a domestic violence victim [and] part of the incredibly limited class of people Defendants knew RJ was actively threatening: Amylyn, her parenting partner, and their children." [Filing No. 84 at 14.] She asserts that the fact that Defendants spent more than an hour talking with Amylyn coupled with "the repeated knowing lies [and] the continued disregard for Amylyn's safety" shocks the conscience. [Filing No. 84 at 15.] Finally, Ms. Rakes relies on three Seventh Circuit Court of Appeals cases which

29

she claims clearly established "that state actors can violate a victim's constitutional rights by making false assurances about her safety" – *Monfils v. Taylor*, 165 F.3d 511 (7th Cir. 1998); *Paine v. Carson*, 678 F.3d 500 (7th Cir. 2012); and *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993). [Filing No. 84 at 18-20.] Ms. Rakes asserts that "Amylyn had a clearly established right not to be harmed by the actions of state actors," and that "[Defendants] made false assurances to Amylyn that they had taken steps to put RJ on a 24-hour hospital stay [and] [h]ad they actually done so, Amylyn would have awoken on July 19, 2019 and escaped with the AR-15 and her dog to her parents' home in New Albany." [Filing No. 84 at 20.]

In their reply, Defendants argue that Ms. Rakes did not respond to their argument that they did nothing to cut off Amylyn's avenues of aid. [Filing No. 86 at 3.] Defendants reiterate that they removed RJ from Amylyn's presence, returned both of her guns to her, confiscated RJ's gun and cell phone, instructed Amylyn to gather weapons from her home and then go to her parents' house, offered her access to a women's shelter, and encouraged her to get a protective order and a divorce. [Filing No. 86 at 3-4.] Defendants assert that Ms. Rakes' characterization of their actions as four "affirmative acts" – (1) Officer Johnson telling Amylyn that RJ would be hospitalized for 24 hours at least twice while Officer Roederer stood by silently, (2) making arrangements to conceal RJ's conduct from medical providers and other law enforcement so that he could leave the hospital when he liked, (3) failing to tell Amylyn that RJ would also be returning home when she told Defendants she was going home, and (4) lying to her which caused her to be home with RJ "free to kill her" – are really one or two instances of failing to ensure that RJ stayed in the hospital for 24 hours and failing to alert medical providers to RJ's conduct and do not constitute affirmative acts for which liability may attach. [Filing No. 86 at 4-5.] Defendants reiterate their arguments that RJ was a danger to Amylyn long before the July 18

encounter and that their conduct was not conscience shocking.  [Filing No. 86 at 8-11.]  As to whether the law was clearly established, they assert that Ms. Rakes has defined Amylyn's Fourteenth Amendment right as the right to be free from "state actors…placing [her] in the path of dangerous criminal acts by third parties."  [Filing No. 86 at 14 (quotation and citation omitted).]  Defendants contend that "[t]his lofty definition is but one floor down from the words of the Fourteenth Amendment itself and two floors from the highest possible level of generality – the right to be free from a constitutional violation."  [Filing No. 86 at 14.]  They argue that discovery has shown that they never promised that RJ would be held for 24 hours, never told Amylyn that it was safe to go home, and actually encouraged her to go elsewhere.  [Filing No. 86 at 15.]  Defendants attempt to distinguish *Monfils*, *Paine*, and *Reed* and point to caselaw that they argue stands for the proposition that the state-created danger exception is no longer recognized by the Seventh Circuit.  [Filing No. 86 at 14-16.]

"'[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'"  *Pierner-Lygte v. Hobbs*, 60 F.4th 1039, 1044 (7th Cir. Feb. 23, 2023) (quoting *District of Columbia v. Wesby*, --- U.S. ----, 138 S. Ct. 577, 589 (2018)).  "If either inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (emphasis omitted).  Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Court turns first to whether Amylyn's Fourteenth Amendment right, under the circumstances presented on July 18, 2019, was clearly established.  As the Court noted in its

31

October 18, 2022 Order denying Defendants' Motion for Judgment on the Pleadings, the Due Process Clause generally has not been interpreted to require state actors to protect individuals from injuries caused by private actors, *DeShaney*, 489 U.S. at 195, but a state-created danger exception to that general rule has been recognized where a state action "affirmatively creates a danger that injures the individual," *Jaimes v. Cook Cnty.*, 2022 WL 2806462, at *3 (7th Cir. July 18, 2022). The state-created danger exception is only "found under 'rare and often egregious' circumstances." *Id.* (quoting *Doe v. Village of Arlington Heights*, 782 F.3d 911, 917 (7th Cir. 2015)); *see also First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 988 (7th Cir. 2021) ("The *DeShaney* exception for state-created dangers is narrow.").

Ms. Rakes' claim that Defendants violated Amylyn's constitutional rights is based on her argument that Defendants limited Amylyn's ability to protect herself by assuring her that RJ would be held for 24 hours at the hospital and that it was safe to go home, but doing nothing to make sure that he was held for 24 hours.[5] But the evidence shows that Officer Roederer made no representations whatsoever to Amylyn regarding how long RJ would be in the hospital or whether it was safe for her to return home, and that Officer Johnson responded "yes" twice when Amylyn asked him if RJ would be in the hospital for 24 hours but also told her repeatedly to

---

[5] Ms. Rakes also seems to hint that Defendants violated Amylyn's constitutional rights because they did not follow internal procedures by failing to file a report on the evening of July 18, 2019 and because they concealed the picture of RJ holding a gun to his head since they did not want to have to go through the steps required by Indiana statutes related to detaining individuals with mental health issues. [*See* Filing No. 84 at 7-9.] But the failure to follow internal procedures or to comply with state law does not amount to a constitutional violation. *See Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) ("42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or… departmental regulations and police practices.").

gather her things and go to her parents' house for the night and to take action to separate herself from RJ in the future.[6]

"To counter the defense of qualified immunity, a plaintiff must show that the constitutional right at issue was clearly established at the time of the alleged violation." *Greene v. Teslik*, 2023 WL 2320767, at *3 (7th Cir. Mar. 2, 2023) (quotation and citation omitted). In order for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby*, 138 S. Ct. at 590. While a plaintiff "need not produce a case directly on point,…the 'legal principle [must] clearly prohibit the officer's conduct in the particular circumstances before him.'" *Pierner-Lytge*, 60 F.4th at 1044 (quoting *Wesby*, 138 S. Ct. at 590). The clearly established law "must share specific details with the facts of the case at hand." *Doxtator v. O'Brien*, 39 F.4th 852, 863 (7th Cir. 2022). A plaintiff cannot escape the application of qualified immunity by defining in a general manner the constitutional right that she claims was violated. *See City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019). As the Seventh Circuit has explained, defeating qualified immunity "sounds like a high bar because it is – qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 988 (7th Cir. 2021) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

---

[6] A review of Officer Johnson's interactions with Amylyn reflects, at times, a less-than-sympathetic and dismissive attitude toward Amylyn and her continued involvement in the abusive relationship with RJ. The Court encourages the Charlestown Police Department to evaluate its training protocol related to responding to domestic violence situations and points it to training resources provided by the Indiana Coalition Against Domestic Violence at https://icadvinc.org/icadv-trainings/#1552499912276-ce9fc623-e358 as a starting point.

Ms. Rakes relies upon three cases – *Paine*, *Reed*, and *Monfils*[7] – in arguing that Amylyn's constitutional rights were clearly established.  In *Paine*, Christina Eilman was arrested outside Chicago's Midway Airport after acting erratically.  678 F.3d at 503.  Ms. Eilman had bipolar disorder and was "in an acute manic phase," but did not disclose her mental-health background to the arresting officers.  *Id.* at 504.  Additionally, the officers did not believe Ms. Eilman's step-father when he told them Ms. Eilman was bipolar, nor did they record this information in Ms. Eilman's file when her mother also advised them of Ms. Eilman's mental-health background.  *Id.* at 504.  The officers took Ms. Eilman to a station that had a holding facility for women and, although she continued to act erratically, she was released on her own recognizance the next evening.  *Id.*  When Ms. Eilman left the station (without her cell phone because officers had not returned it to her), she did not immediately leave the neighborhood, which had "an exceptionally high crime rate."  *Id.*  Additionally, Ms. Eilman "was lost, unable to appreciate her danger, and dressed in a manner that attracted attention," and was "white and well off while the local population [was] predominantly black and not affluent, causing her to stand out as a person unfamiliar with the environment and thus a potential target for crime."  *Id.*  Ms. Eilman eventually wound up at an apartment where she was raped at knifepoint and then jumped out of a seven-story window in an attempt to escape and suffered severe brain damage.  *Id.* at 504-06.  The Seventh Circuit found that the officers were not entitled to qualified immunity because "[i]t is clearly established that state actors who, without justification, increase a person's risk of harm violate the Constitution," noting that "people propelled into danger by public employees have a good claim under the Constitution."  *Id.* at 510.

---

[7] The Court discussed these cases in detail in its October 18, 2022 Order denying Defendants' Motion for Judgment on the Pleadings, [Filing No. 63], and borrows from that Order in again setting forth the facts and rulings in those cases.

In *Reed*, state troopers had arrested Cathy Irby, leaving the passenger in her car, Larry Rice, with Ms. Irby's car keys even though they should have known that Mr. Rice was intoxicated. 986 F.2d at 1124. Later that evening, Mr. Rice, while still intoxicated and while being pursued at a high speed by a Deputy Sheriff, collided with a car driven by Richard Reed. *Id.* at 1123. The collision killed Mr. Reed's wife and their unborn child, and injured the other occupants of Mr. Reed's car. *Id.* at 1123-24. The Seventh Circuit found that Mr. Reed's Fourteenth Amendment rights were violated because "[t]he officers…initiated the state action, by arresting [Ms.] Irby and removing her from the car. That state intervention created the dangerous condition, a drunk driver on the road." *Id.* at 1126. The Seventh Circuit noted that "removing one drunk driver and failing to prevent replacement by another drunk [driver] will not subject officers to section 1983 liability," but that "[i]t is the special circumstance plead in this case, that the defendants removed a driver, who it must be inferred was sober, and left behind a passenger, whom they knew to be drunk, with the car keys, that states a claim for deprivation of constitutional rights under [§ 1983]." *Id.* at 1127.

In *Monfils*, Thomas Monfils called police to inform them that a fellow employee, Keith Kutska, was planning to steal an electrical cord when he left work at the James River Paper Mill in Green Bay, Wisconsin. 165 F.3d at 513. The police informed security at the Mill, security stopped Mr. Kutska on his way out the door, and Mr. Kutska was suspended for five days after refusing to submit to a search. *Id.* at 513. Mr. Kutska then set out to determine who had reported him to the police, and he eventually obtained a tape recording of Mr. Monfils' call from the police department even though a police officer had assured Mr. Monfils and the assistant district attorney that the tape would not be released. *Id.* at 513-15. Subsequently, Mr. Monfils was beaten and thrown into a pulp vat at the mill with a 50-pound weight tied around his neck,

where he was discovered, deceased, two days later. *Id.* at 513. Mr. Kutska and six co-workers were found guilty of murdering Mr. Monfils. *Id.* The Seventh Circuit found that the officer who assured Mr. Monfils and the assistant district attorney that the tape would not be released but did nothing to make sure it was not released was not entitled to qualified immunity because "by assuring [Mr. Monfils and the assistant district attorney] that he would make sure the tape was not released but not following through, he created a danger [Mr.] Monfils would not otherwise have faced." *Id.* at 518.

As the Court found in its October 18, 2022 Order, *Paine*, *Reed*, and *Monfils* "stand for the proposition that a state actor may not, by his affirmative acts and through special circumstances, place an individual in more danger from the acts of a private citizen than they were in before the encounter with the state actor by limiting their ability to protect themself." [Filing No. 63 at 17.] The state-created danger exception to *DeShaney* is very fact-specific, and the facts in *Paine*, *Reed*, and *Monfils* differ significantly from the facts in this case such that their holdings did not put Defendants on notice that their actions constituted a constitutional violation.

As to Officer Roederer, Ms. Rakes has not pointed to any evidence – and there does not appear to be any – that Officer Roederer made any representations to Amylyn regarding the length of RJ's hospital stay or whether Amylyn would be safe if she returned home that evening.[8] To the extent Ms. Rakes relies on Officer Roederer's inaction, and his failure to correct any statements by Officer Johnson, neither *Paine*, *Reed*, or *Monfils* stand for the proposition that this type of inaction constitutes a constitutional violation. Indeed, the Seventh Circuit has held that

---

[8] This lack of evidence of any personal involvement on Officer Roederer's part is another ground for granting summary judgment on Amylyn's Fourteenth Amendment due process claim against him. *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) ("[I]ndividual liability under § 1983…requires personal involvement in the alleged constitutional deprivation.").

"mere inactivity by police does not give rise to a constitutional claim." *Rossi v. Chicago*, 790 F.3d 729, 735 (7th Cir. 2015).

Turning to Officer Johnson, Ms. Rakes focuses on two instances where Officer Johnson answered "yes" when Amylyn asked him if RJ would be held in the hospital for 24 hours. [*See* Filing No. 67-4 at 77-78 ("OFFICER JOHNSON:  Are you going to go to your house?  You're – you're going to be at your parents' house?  AMYLYN:  Well, you – you said it's a 24-hour thing, right?  For an evaluation?  OFFICER JOHNSON:  Yeah, so what are [you] going to do?  Are you going to go to your house?  AMYLYN:  (Inaudible)."); Filing No. 67-4 at 97 ("OFFICER JOHNSON:  Okay.  So are you going to go to your house?  AMYLYN:  Well, tonight, yeah.  OFFICER JOHNSON:  Are you going to –.  AMLYN:  You said it's a 24 hour?  OFFICER JOHNSON:  Yeah.").]  She also focuses on Officer Johnson's failure to tell EMS personnel about RJ's threats to commit suicide and to harm Amylyn.

*Paine*, *Reed*, and *Monfils* did not put Officer Johnson on notice that his actions violated Amylyn's constitutional rights.  Amylyn was not "propelled into danger" by Officer Johnson, *see Paine*, 678 F.3d at 510, and Officer Johnson's actions did not create a dangerous condition, *see Reed*, 986 F.2d at 1126.  The circumstances in *Monfils* are closest to the facts of this case but unlike the police officer in *Monfils*, Officer Johnson did not promise Amylyn that RJ would be held for 24 hours and that she would be safe at her house.  *See Monfils*, 165 F.3d at 518.  To the contrary, although the Court acknowledges that Officer Johnson did respond affirmatively twice when Amylyn asked him if RJ would be held for 24 hours, the totality of the evidence could not lead a reasonable factfinder to conclude that Officer Johnson took some affirmative action by promising Amylyn that she would be safe at her home for 24 hours and then failing to follow through on that promise.  Rather, the evidence shows that Officer Johnson spent considerable

time trying to talk Amylyn into getting her belongings from her house and going to her parents' house to stay for the night.  [*See, e.g.*, Filing No. 67-4 at 29 (Officer Johnson telling Officer Roederer "I told her she needs to go to her parents' house"); Filing No. 67-4 at 34 (Officer Johnson telling Amylyn "But you're going to your parents' house"); Filing No. 67-4 at 77 (Officer Johnson asking Amylyn "Are you going to go to your house?  You're – you're going to be at your parents' house?").]  He also discussed with her how to get a protective order and encouraged her to remove herself from the abusive relationship with RJ.  [*See, e.g.*, Filing No. 67-4 at 39 (Officer Johnson telling Amylyn "But you should not be in an abusive relationship if he's putting his hands on you and if he's abusing you.  There's places you can go.").]  And unlike in *Monfils*, where the release of the tape created the danger by alerting Mr. Kutska that Mr. Monfils had reported him to the police, Officer Johnson's actions did not create a dangerous condition.  RJ had been a danger to Amylyn for months before the incident and would likely have continued to be so even if he had been held for 24 hours at the hospital.  Further, nothing that Officer Johnson did or said limited Amylyn's ability to protect herself.  *See DeShaney*, 489 U.S. at 200.

Because there was not clearly established law in effect at the time of the July 18, 2019 incident that put Officers Roederer and Johnson on notice that their actions violated Amylyn's constitutional rights, they are entitled to qualified immunity and the Court **GRANTS** their Motion for Summary Judgment on Ms. Rakes' Fourteenth Amendment due process claim.

### B.        Section 1985 Conspiracy Claim

In support of their Motion for Summary Judgment, Defendants argue that even if the Court finds that there was an underlying constitutional violation, there is no evidence of any agreement, concerted action, or discriminatory animus toward Amylyn because of her gender.

[Filing No. 70 at 31-32.]   They also assert that even if there was evidence of discriminatory animus, the intracorporate-conspiracy doctrine bars the conspiracy claim because "employees of the same company cannot be liable under a conspiracy theory if the employees act within the scope of their employment," and Officers Roederer and Johnson were both employees of the Charlestown Police Department.   [Filing No. 70 at 32 (quotation and citation omitted).]

In response, Ms. Rakes argues that Defendants conspired with RJ and with each other "when they agreed to conceal the photo of RJ and other information about that evening in order to avoid complying with [Indiana law regarding detaining individuals with mental health issues]."   [Filing No. 84 at 16.]   She contends that the intracorporate-conspiracy doctrine does not apply because Defendants conspired with RJ and because Defendants "were not pursuing a lawful goal of the government."   [Filing No. 84 at 17.]   Ms. Rakes also argues that Defendants exhibited discriminatory animus toward Amylyn based on her gender by discrediting her reports of abuse, crediting RJ's claim that nothing physical had happened, "with[holding] help from Amylyn even though she repeatedly asked for it," "repeatedly challeng[ing] her fitness as a mother," telling Amylyn that she enjoyed the fact that RJ was forcing her to engage in sexual acts with other men and referring to her as a prostitute, not believing that she was a victim of sex trafficking, and not believing that RJ had a gun in his waistband when he was arguing with Amylyn in the street.   [Filing No. 84 at 18.]

Defendants argue in their reply that the evidence does not support Ms. Rakes' claim that they conspired with RJ because after RJ left the scene, Officer Johnson asked Amylyn for the picture of RJ with a gun to his head and his text messages to Amylyn to support the fact that they had sent RJ to the hospital.   [Filing No. 86 at 11.]   They also note that Officer Johnson detailed RJ's conduct and the picture in his case report, as did Officer Roederer.   [Filing No. 86 at 11-12.]

Defendants contend that the exception to the intracorporate-conspiracy doctrine where there has been a series of discriminatory acts does not apply because Ms. Rakes' claim "is centered on one singular and isolated occurrence that involves only two officers," and that the exception for not pursuing a lawful goal of the government also does not apply as there is no evidence to support its application.  [Filing No. 86 at 12-13.]  Defendants also argue that "[t]here is simply nothing in the video evidence to suggest that Defendants agreed to conspire against Amylyn due to her gender."  [Filing No. 86 at 13.]

42 U.S.C. § 1985(3) "provides a cause of action for persons who are victims of a conspiracy to deprive them of the equal protection of the laws or equal privileges and immunities under the laws." *Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 827 (7th Cir. 2022) (quotations and citations omitted).  A plaintiff bringing a claim under § 1985(3) must prove: (1) the existence of a conspiracy; (2) that the conspiracy was "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws"; (3) "an act in furtherance of the conspiracy"; and (4) an injury to the plaintiff's person or property or a deprivation of any right or privilege of a citizen of the United States. *Id.* (citing *United Bhd. of Carpenters v. Scott*, 463 U.S. 825, 828-29 (1983)).  Additionally, the plaintiff must prove that the conspiracy was motivated by a racial or other class-based invidiously discriminatory animus. *Milchtein*, 42 F.4th at 827.

### 1. Conspiracy Between Officer Roederer and Officer Johnson

As for Ms. Rakes' claim that Defendants conspired with each other, the intracorporate conspiracy doctrine precludes a conspiracy where the conspiracy is between members of the same entity, and the Seventh Circuit has held that the doctrine applies to both private and governmental entities. *See Wright v. Illinois Dep't of Children & Family Servs.*, 40 F.3d 1492,

1508-09 (7th Cir. 1994). An exception to the intracorporate conspiracy doctrine exists where "the conspiracy was part of some broader discriminatory pattern," *Hartman v. Bd. of Trustees of Cmty. Coll. Dist. No. 508, Cook Cnty., Ill.*, 4 F.3d 465, 470-71 (7th Cir. 1993), but Ms. Rakes has not presented any evidence that the alleged conspiracy between Officer Roederer and Officer Johnson fits within this exception. Rather, their allegedly discriminatory acts were limited to their dealings with Amylyn on the evening of July 18, 2019.

However, the intracorporate conspiracy doctrine "applies only when the agents of a corporation or government entity act within the scope of their employment in joint pursuit of the entity's lawful business." *Gray v. City of Chicago*, 2022 WL 910601, at *14 (N.D. Ill. Mar. 29, 2022) (quotation, citation, and emphasis omitted). The illegal conduct Ms. Rakes alleges here – discriminating against Amylyn due to her gender – would not be part of the Charlestown Police Department's lawful business, so the intracorporate conspiracy doctrine does not bar Ms. Rakes' conspiracy claim.

In any event, Ms. Rakes has not presented any evidence that a conspiracy between Officer Roederer and Officer Johnson to discriminate against Amylyn based on her gender existed. Ms. Rakes points to evidence that she claims indicates that Defendants believed RJ over Amylyn and did not take the situation seriously. [*See* Filing No. 84 at 18.] But Defendants concluded that they could not charge RJ with having a gun and hitting Amylyn because the 911 callers did not say definitively that they had seen a gun and because there were no visible marks on Amylyn indicating that she had been hit. And despite Ms. Rakes' characterization, the female 911 caller did not say definitively that RJ had a gun, but rather said he had what "looked to be a gun." [*See* Roederer Dash Cam at 20:00-20:23.] The fact that Defendants concluded that they

did not have enough evidence to charge RJ is not evidence of a conspiracy to discriminate against Amylyn based on her gender.

Additionally, Ms. Rakes' characterization of other evidence of a conspiracy is not supported by her citations to the record.  Specifically:

- Ms. Rakes contends that Defendants "withheld help from Amylyn even though she repeatedly asked for it" and "repeatedly challenged her fitness as a mother," citing to Officer Johnson's dash cam video at 34:34 and 38:35. [Filing No. 84 at 18.]  Those excerpts reflect that Officer Johnson explained that they did not have a reason to arrest RJ but that Amylyn needed to take care of herself.  When Amylyn asked what she was supposed to do tomorrow and the next day, Officer Johnson discussed how she could get a no-contact order and encouraged her to leave the abusive relationship with RJ.  [Johnson Dashcam at 33:41-34:57.]  The excerpts also reflect that Officer Johnson told Amylyn she should worry about herself and her children, and not RJ. [Johnson Dashcam at 38:32-38:36.]  No reasonable jury could conclude from this evidence that Defendants withheld help from Amylyn or repeatedly challenged her fitness as a mother.

- Ms. Rakes asserts that Officer Johnson told Amylyn she "enjoyed doing it" when Amylyn told him that RJ was forcing her to engage in sexual acts with other men, and that he later referred to Amylyn as a prostitute, citing to Officer Johnson's dash cam video at 1:14:18 and to two calls with dispatch. But the dash cam video actually reflects that Amylyn apologized for telling Defendants about RJ sending her out to engage in sexual acts with other men and said it was very degrading to her, and Officer Johnson said "[i]f nobody's threatened you to do it and you want to do it because you enjoy doing it, there's nothing wrong with that."  [Johnson Dashcam at 1:13:57-1:14:26.] This is different than Officer Johnson telling Amylyn that she enjoyed engaging in sexual acts with other men.  As for the calls with dispatch, in one call the dispatcher told an unknown caller (presumably another officer or detective) that Officer Johnson called in to dispatch after the July 18, 2019 encounter and stated that "this girl was supposed to be a prostitute." [Filing No. 83-2 at 02:28-02:32.]  In the other call, Officer Johnson told the dispatcher that Amylyn told him "that [RJ] was making her prostitute." [Filing No. 83-3 at 00:36-00:46.]  No reasonable factfinder could interpret these statements to stand for the proposition that Officer Johnson was referring to Amylyn as a prostitute.  And to the extent Officer Roederer did not believe that Amylyn was the victim of sex trafficking as Ms. Rakes claims, that does not show that he engaged in a conspiracy with Officer Johnson based on Amylyn's gender.

Further – and most significantly – even if the cited evidence supported Ms. Rakes' contentions that Defendants discredited Amylyn's claims, Ms. Rakes has not presented any evidence that Defendants' actions were motivated by Amylyn's gender.  Ms. Rakes simply has not presented evidence from which a reasonable jury could conclude that Defendants conspired with each other to discriminate against Amylyn based on her gender.

2.   *Conspiracy Between Defendants and RJ*

As for an alleged conspiracy between Defendants and RJ, Ms. Rakes argues that they all "agreed to conceal the photo of RJ [holding a gun to his head] and other information about that evening in order to avoid complying with [Indiana law regarding detaining individuals with mental health issues]," and "Defendants did not report RJ's conduct to anyone, told Amylyn they'd complied [with Indiana law], and RJ went to the hospital and lied about what had happened." [Filing No. 84 at 16.]  But the evidence shows that Officer Johnson asked Amylyn for the picture of RJ with a gun to his head numerous times, [*see, e.g.*, Filing No. 67-4 at 46; Filing No. 67-4 at 76-77], and included that information in his report of the incident, [Filing No. 74-5 at 10-12].  And again, although Ms. Rakes has pointed to evidence which may permit a reasonable factfinder to conclude that Defendants concealed certain information from EMS personnel to avoid having to complete the more involved process required to detain an individual with mental health issues, she has not presented any evidence from which a reasonable factfinder could conclude that Defendants did not share the picture or information with EMS personnel due to Amylyn's gender.

In short, Ms. Rakes has not presented evidence from which a reasonable jury could conclude that Defendants conspired with each other or with RJ to discriminate against Amylyn

based on her gender.  The Court **GRANTS** Defendants' Motion for Summary Judgment on Ms. Rakes' conspiracy claim.

## IV.
### CONCLUSION

The facts of this case are tragic, and the Court sympathizes with Amylyn's family and friends and understands their desire to hold someone other than RJ accountable for Amylyn's death.  The Court also understands their perception that Defendants lacked sympathy for Amylyn and the difficulties she was facing due to her abusive relationship with RJ.  But the case law relied upon by Plaintiff does not clearly establish a violation of Amylyn's Fourteenth Amendment rights on the evening of July 18, 2019, and Defendants are entitled to qualified immunity for their actions.  Further, Ms. Rakes has not presented evidence from which a reasonable jury could conclude that Defendants conspired to discriminate against Amylyn based on her gender.  For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment.  [67.]  Final judgment shall enter accordingly.  Additionally, the pending Motion for Contempt filed by Ms. Rakes, [101], is **DENIED AS MOOT** and all deadlines in this case are **VACATED**.

Date: 3/30/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

44